243 P.3d 521 (2010)
Certification from the United States Court of Appeals for the Ninth Circuit in AFFILIATED FM INSURANCE COMPANY, a Rhode Island corporation, Plaintiff-Appellant,
v.
LTK CONSULTING SERVICES, INC., a Pennsylvania corporation, Defendant-Appellee.
No. 82738-9.
Supreme Court of Washington, En Banc.
Argued October 20, 2009.
Decided November 4, 2010.
*523 William E. Pierson Jr., Law Office of William E. Pierson Jr. PC, Seattle, WA, for Plaintiff.
Brandon Hummel, Steven Stein, Jeffrey Winick, C. Steven Tomashefsky, Stein Ray & Harris LLP, Chicago, IL, Terence J. Scanlan, Skellenger Bender, P.S., Seattle, WA, for Defendant.
FAIRHURST, J.
¶ 1 A fire ignited on the Seattle Monorail System's (Seattle Monorail) blue train in 2004. The monorail's private operating company, Seattle Monorail Services (SMS), suffered millions of dollars in losses. The question presented is whether SMS, which does not own the Seattle Monorail, can bring a tort action against LTK Consulting Services, Inc., an engineering firm that worked on monorail maintenance before the fire, for negligently causing the fire. LTK assumes, for the sake of argument in its motion for summary judgment, that the cause of the fire was the train's faulty grounding system, the design of which LTK had itself suggested. LTK argues, however, that SMS's damages are purely economic losses stemming from repair costs, which SMS was contractually obligated to pay, and from business interruption. LTK believes that SMS's tort claims for such damages are barred under Washington tort law. We disagree. By undertaking professional engineering services, LTK bore a tort law duty of reasonable care encompassing safety risks of physical damage to SMS's property interests in the monorail. Hence, SMS's subrogee, Affiliated FM Insurance Company (AFM), may bring a claim of negligence against LTK for LTK's tortious injury of those interests.

I. FACTUAL AND PROCEDURAL HISTORY

A. The fire
¶ 2 The Seattle Monorail is the elevated transportation system that connects Seattle Center with downtown Seattle, Washington. One day in May 2004, after leaving the Seattle Center Station with a load of passengers, the monorail blue train caught fire. The fire started beneath the floor of the passenger compartment of the train's front two cars, but the fire soon pierced the floor and engulfed the seating in both front passenger cars. Smoke from the fire spread to all four blue train cars. On the other monorail track, the red train stopped alongside the blue train, helping passengers escape. The red train was damaged by smoke. The cause of the fire was later found to be electrical: a shaft in the monorail's blue train motor had disintegrated, colliding with an electrically charged collector shoe.

B. SMS and the monorail concession agreement
¶ 3 Ten years before the fire, in 1994, the city of Seattle (City) entered a monorail concession agreement with SMS. The agreement granted rights to SMS related to the operation of the monorail:
The City hereby grants to [SMS] . . . the concession right and privilege to maintain and exclusively operate the Monorail System including the facilities, personal property *524 and equipment, together with the right to use and occupy the areas, described in this section, all subject to the conditions and requirements set forth in this Agreement.
Excerpt of Record (ER) 030, Ex. 1, § III.A. The agreement permitted SMS to run concession stands and required SMS to collect fares according to an agreed schedule. In exchange for these rights, SMS promised to pay "concession fees and charges" to the City. ER 034, Ex. 1, § V.A.
¶ 4 The agreement allocated responsibility among SMS and the City for maintaining the monorail. ER 053-074, Ex. 1, § XI.A-N. LTK and AFM agree that SMS bore the responsibility for emergency maintenance. ER 395. The agreement required SMS to grant the City "access to the Monorail System at all reasonable times to inspect the same and to make any repair, improvement, alteration or addition thereto of any property owned by or under control of the City." ER 095, Ex. 1, § XIX.A. To the extent "reasonably required" for such repairs or improvements, the agreement permitted the City to "interfere with the conduct of the business and operations of [SMS]." Id. § XIX.B.
¶ 5 The agreement also required SMS to carry an insurance "policy for fire and extended coverage, upset, collision and overturn, vandalism, malicious mischief, and other perils commonly included in the special coverage form," with the City designated as the loss payee. ER 081-082, Ex. 1, § XVII.A.1. In the event of damage from a fire for which SMS was not responsible, the agreement gave SMS the right to suspend payments to the City or terminate the agreement altogether, depending on the severity of the damage. ER 097, Ex. 1, § XXII.B-C.

C. LTK works on the monorail
¶ 6 The City contracted with LTK in 1999 "to examine the Monorail system and recommend repairs." Resp. Br. of LTK at 3. LTK completed its contractual obligations by 2002. The agreement between the parties is not before us, but we understand that SMS was not a party to the contract.

D. After the fire, AFM becomes involved
¶ 7 SMS and the City amended their agreement after the fire to allocate the costs and responsibilities for repairing the fire and smoke damage to the monorail. ER 349-50. SMS's insurer, AFM, paid $3,267,861 to SMS and was subrogated to SMS's rights against LTK. Asserting those rights now, AFM seeks to recover damages from LTK for SMS's losses.

E. The lawsuit
¶ 8 AFM brought suit against LTK in King County Superior Court in November 2006, claiming that LTK was negligent "in changing the electrical ground system for the Blue and Red Trains." ER 003, Compl. ¶ 4.2. AFM alleges that as part of LTK's contract with the City, "LTK Engineering recommended that the grounding system for the Blue and Red Trains that made up the Seattle Monorail System be changed." ER 002, Compl. ¶ 3.1.
¶ 9 LTK removed the suit to the United States District Court for the Western District of Washington and moved for summary judgment. LTK denied that it suggested changes to the trains' grounding system or that these changes were implemented, but for purposes of argument on summary judgment, assumes "that it recommended changes to the City, that those changes were implemented, and that their implementation resulted in a condition where the fault that occurred as a result of the drive shaft disintegration was not prevented." ER 384 n. 2 (Def.'s Mot. for Summ. J.). However, LTK argued that SMS's losses were purely economic and that it was not liable in tort for economic losses, at least in this circumstance where it was not in contractual privity with SMS. The losses were purely economic, in LTK's view, because they stemmed from business interruptions and SMS's contractual obligations to repair the City's monorail trains, and SMS did not have a property interest in the Seattle Monorail. The district court granted LTK's motion for summary judgment and denied AFM's motion for reconsideration.
¶ 10 AFM appealed to the United States Court of Appeals for the Ninth Circuit, which *525 certified the following question for this court's review:
May party A (here, SMS, whose rights are asserted in subrogation by AFM), who has a contractual right to operate commercially and extensively on property owned by non-party B (here, the City of Seattle), sue party C (here, LTK) in tort for damage to that property, when A(SMS) and C(LTK) are not in privity of contract?
Affiliated FM Ins. Co. v. LTK Consulting Servs., Inc., 556 F.3d 920, 922 (2009). The Ninth Circuit indicated it will "affirm the district court's grant of summary judgment in favor of LTK" if we "decide[] the economic loss rule, or some other rule, bars such a suit in tort." Id. We accepted the certified question pursuant to the Federal Court Local Law Certificate Procedure Act, chapter 2.60 RCW, and RAP 16.16.

II. ANALYSIS
¶ 11 The federal district court concluded that SMS's injury was "outside the bounds of tort recovery" because it was "strictly economici.e., business interruption and the cost of repairing the damaged train." Affiliated FM Ins. Co. v. LTK Consulting Servs., Inc., 2007 WL 2156593, at *4 (W.D.Wash.). In so holding, the court relied on a doctrine of Washington law that we have previously termed the "economic loss rule," which is "a doctrine that has attempted to describe the dividing line between the law of torts and the law of contracts." Eastwood v. Horse Harbor Found., ___ Wash.2d ___, ___, 241 P.3d 1256 (2010). However, as we said of the state Court of Appeals in Eastwood, the federal district court's "broad reading of this court's jurisprudence on the economic loss rule, while perhaps understandable, is not correct." Id. at 1261, 241 P.3d 1256. In Eastwood, we recognized two perils to treating this doctrine as a bright-line "rule of general application" that holds "any time there is an economic loss, there can never be recovery in tort." Id. at 1261, 241 P.3d 1256. "First, it pulls too many types of injuries into its orbit" because the definitions of economic injuries are broad and malleable. Id.[1] Second, "[e]conomic losses are sometimes recoverable in tort, even if they arise from contractual relationships." Id. For these reasons, we concluded that "[t]he term `economic loss rule' has proven to be a misnomer." Id.
¶ 12 In a case like this one, where a court applying Washington law is called to "distinguish between claims where a plaintiff is limited to contract remedies and cases *526 where recovery in tort may be available," id. at 1261-62, 241 P.3d 1256, the court's task is not to superficially classify the plaintiff's injury as economic or noneconomic. Rather, the court must apply the principle of Washington law that is best termed the independent duty doctrine. See id. at 1272, 241 P.3d 1256. Under this doctrine, "[a]n injury is remediable in tort if it traces back to the breach of a tort duty arising independently of the terms of the contract." Id. at 1262, 241 P.3d 1256. Using "ordinary tort principles," the court decides as a matter of law whether the defendant was under an independent tort duty. Id. at 1262, 241 P.3d 1256. In the law of negligence, a duty of care "is defined as `an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another.'" Transamerica Title Ins. Co. v. Johnson, 103 Wash.2d 409, 413, 693 P.2d 697 (1985) (quoting WILLIAM L. PROSSER, HANDBOOK OF THE LAW OF TORTS § 53, at 331 (3d ed.1964)). The duty of care question implicates three main issues"its existence, its measure, and its scope." DAN B. DOBBS, THE LAW OF TORTS § 226, at 578 (2000).[2] So the duty question breaks down into three inquiries: Does an obligation exist? What is the measure of care required? To whom and with respect to what risks is the obligation owed?
¶ 13 To decide if the law imposes a duty of care, and to determine the duty's measure and scope, we weigh "considerations of `logic, common sense, justice, policy, and precedent.'" Snyder v. Med. Serv. Corp. of E. Wash., 145 Wash.2d 233, 243, 35 P.3d 1158 (2001) (internal quotation marks omitted) (quoting Lords v. N. Auto. Corp., 75 Wash. App. 589, 596, 881 P.2d 256 (1994)). (Hereinafter, we will call these considerations "the duty considerations.") "The concept of duty is a reflection of all those considerations of public policy which lead the law to conclude that a `plaintiff's interests are entitled to legal protection against the defendant's conduct.'" Taylor v. Stevens County, 111 Wash.2d 159, 168, 759 P.2d 447 (1988) (quoting W. PAGE KEETON, ET AL., PROSSER AND KEETON ON TORTS § 53, at 357 (5th ed.1984)). Using our judgment, we balance the interests at stake. See, e.g., Hunsley v. Giard, 87 Wash.2d 424, 435, 553 P.2d 1096 (1976) (balancing the interests and holding that the defendant owed the plaintiff "a duty to avoid the negligent infliction of mental distress").[3]
*527 ¶ 14 LTK seems to put at issue every aspect of its tort dutythe existence, measure, and scope. LTK argues, "LTK's duty of care was created by its contract with the City, and that contract created no independent duty to avoid SMS' or AFM's economic loss." Resp. Br. of LTK at 29.

A. Does an engineering firm undertaking engineering services assume a tort law duty of reasonable care independent of its contractual obligations?
¶ 15 At issue first is the existence of a duty of care independent of LTK's contract with the City. Viewed within the framework of our duty analysis, the question is this: Do the duty considerations dictate that engineers who provide services be required by law to use reasonable care? An initial policy consideration is the usefulness of private ordering. We assume private parties can best order their own relationships by contract. The law of contracts is designed to protect contracting parties' expectation interests and to provide incentives for "parties to negotiate toward the risk distribution that is desired or customary." Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1, 124 Wash.2d 816, 827, 881 P.2d 986 (1994). In contrast, "tort law is a superfluous and inapt tool for resolving purely commercial disputes." Miller v. U.S. Steel Corp., 902 F.2d 573, 574 (7th Cir.1990). If aggrieved parties to a contract could bring tort claims whenever a contract dispute arose, "certainty and predictability in allocating risk would decrease and impede future business activity." Berschauer/Phillips, 124 Wash.2d at 826, 881 P.2d 986.
¶ 16 In Berschauer/Phillips, we considered how this preference for private ordering affects an engineer's obligations under the law of torts. In that case, the general contractor for a school construction project sued three defendants for negligencethe project's architect, structural engineering company, and construction inspector. Id. at 819-20, 881 P.2d 986. As a result of the defendants' inadequate design plans and faulty inspection work, the contractor claimed that it spent more money than expected and also endured delays in construction, with $3.8 million in losses. Id. at 819, 881 P.2d 986. The contractor conceded these were economic losses. Id. We held that "the economic loss rule does not allow a general contractor to recover purely economic damages in tort from a design professional." Id. at 823, 881 P.2d 986. Our overriding concerns were protecting all of the parties' contractual expectancies and giving an incentive to negotiate risk. Id. at 826-27, 881 P.2d 986. In the context of complex multiparty transactions, at least, the preference for private ordering suggests that an engineer does not operate under extracontractual tort obligations.
*528 ¶ 17 But this case reminds us that a fire can ignite as a result of an engineer's work, imperiling people and property. An interest we must consider is the safety of persons and property from physical injury, an interest that the law of torts protects vigorously. See DOBBS, supra, § 1, at 3 ("Legal rules give the greatest protection to physical security of persons and property."). The record before us does not indicate whether any passengers on the monorail were injured or if the fire caused damage to property beyond the Seattle Monorail. But the parties agree that the fire caused damage to the monorail trains themselves. And, in Washington, it is common knowledge that the monorail trains carry thousands of people every year between Seattle Center and downtown Seattle. A fire on these trains is a severe safety risk, highlighting the interest in safety that is at stake when engineers do their work.
¶ 18 Imposing a duty of care on engineers could be an effective way to guard against unreasonable curtailments of the safety interest in freedom from physical injuries. Because engineers occupy a position of control, they are in the best position to prevent harm caused by their work. Tort liability would force negligent engineers to internalize the costs of their unreasonable conduct, making them more likely to take due care. Further, engineers have ample training, education, and experience, and can use their professional judgment about the design needs of a particular project. By deterring unreasonable behavior before it occurs and placing responsibility in the hands of the persons who can best mitigate the risks, a duty of reasonable care could reduce the overall social costs.
¶ 19 We recognize that some economic considerations militate in favor of holding that an engineer in LTK's shoes is not under a duty of care. Engineers provide socially beneficial services. If tort claims against them were to be layered on top of the breach of contract suits that they already face, the costs of engineering services would likely increase. Although engineers could probably mitigate their risk exposure with malpractice insurance, they might pass along the increased costs of doing business to their clients. And the liability for some accidents could prove so costly that engineering companies go out of business. Society as a whole could incur more costs and could have fewer engineers willing to take on the risks of liability.
¶ 20 On balance, however, we think engineers who undertake engineering services in this state are under a duty of reasonable care. The interest in safety is significant. Although Berschauer/Phillips makes engineers not liable in tort for some classes of harm, extending that case to all classes of harm and all classes of people would be unjust. Even in a calamity, an innocent party who never had the opportunity to negotiate the risk of harm would be forced to bear the costs of a careless engineer's work.
¶ 21 Although we have not held so specifically until now, we think engineers' common law duty of care has long been acknowledged in this state.[4] For example, in Seattle Western Industries, Inc. v. David A. Mowat Co., 110 Wash.2d 1, 10, 750 P.2d 245 (1988), implicitly recognizing the duty exists, we held that the scope of the "engineer's common law duty of care" is not necessarily always limited to the engineer's contractual obligations. The Court of Appeals has explicitly recognized a common law duty of care, holding in G.W. Construction Corp. v. Professional Service Industries, Inc., 70 Wash.App. 360, 366, 853 P.2d 484 (1993), that the defendant engineer performing an inspection under contract had an independent "duty to exercise reasonable engineering skill and judgment." Nationally, it is the same. See, e.g., JAY M. FEINMAN, PROFESSIONAL LIABILITY TO THIRD PARTIES § 11.3.1, at 228 (2000) ("Most courts have extended liability to architects and engineers by applying the ordinary law of negligence."); 4 STUART M. SPEISER ET AL., THE AMERICAN LAW OF TORTS § 15:117, at 852 (1987) ("It is well settled, in the modern law, that architects or engineers may be subject *529 to liability for property loss or damage resulting from defective designs, specifications, plans, drawings, supervision and administration, and the like.").
¶ 22 We are aware of the economic drawbacks of the dangers of creating "liability in an indeterminate amount for an indeterminate time to an indeterminate class." Ultramares Corp. v. Touche, 255 N.Y. 170, 179, 174 N.E. 441 (1931). Still, we think economic concerns about liability run amok are overstated and can be addressed through conventional concepts of the measure and scope of a duty of care.

B. What is the measure of an engineer's duty of care?
¶ 23 A duty of care is necessarily limited to the level of care that is reasonable in the particular circumstances. In these circumstancesan engineer providing professional servicesthe usual measure of care, ordinary care, is not sensitive enough to the technical aspects of an engineer's professional responsibilities. What is reasonable care should be measured against what a reasonably prudent engineer would do. A higher degree of care, such as utmost care, would make engineers insurers and expose them to an intolerably high risk of liability. As Professor DeWolf and Mr. Allen note, "an engineer does not and cannot insure or in any sense guarantee a satisfactory result." 16 DAVID K. DEWOLF & KELLER W. ALLEN, WASHINGTON PRACTICE: TORT LAW AND PRACTICE § 15.51, at 505 (3d ed.2006). Requiring utmost care would be unduly burdensome. We therefore hold the measure of reasonable care for an engineer undertaking engineering services is the degree of care, skill, and learning expected of a reasonably prudent engineer in the state of Washington acting in the same or similar circumstances. Cf. RCW 7.70.040(1) (defining the measure of care for health care providers).
¶ 24 We now turn to the scope of the duty of care.

C. Does the scope of an engineering firm's duty of care encompass companies in SMS's position and the class of harms like the ones suffered by SMS?
¶ 25 By scope, we mean that a duty of care encompasses classes of harm and classes of persons. See DOBBS, supra, § 182, at 450 ("[D]uty rules are classically categorical and abstract; they cover a class or category of cases."). A duty's scope involves a question of law. See, e.g., Schooley v. Pinch's Deli Mkt., Inc., 134 Wash.2d 468, 475 n. 3, 951 P.2d 749 (1998). This is necessarily a judgment built on the duty considerations, and so the reasons for recognizing that a class of people or risks of harm is within the scope of a duty are often the same reasons for recognizing a duty of care in the first instance.

1. Does an engineer's duty of care extend to the class of harm suffered by SMS?

¶ 26 LTK argues it had no obligation with respect to risks of harm to the business expectancies of third parties. LTK argues that SMS was in a position to negotiate better contract terms with the City, but SMS accepted the risk that the City could hire an engineer whose negligence would cause extensive property damage to the monorail and business losses. LTK suggests that SMS made a deal, and we should hold SMS to its bargain. As LTK has framed it, the issue is whether the duty of care assumed by an engineering firm extends to the business expectancies of a company with a commercial interest in the property on which the engineering firm worked. However, the question here is whether an engineer's duty of care extends to safety risks of physical damage to the property on which the engineer works. We hold it does. As we have already observed, the harm in this case exemplifies the safety-insurance concerns that are at the foundation of tort law. A fire broke out suddenly on the Seattle Monorail's blue train, endangering people and causing extensive physical damage to property. Given the safety interest that justifies imposing a duty of care on engineers, LTK was obligated to act as a reasonably prudent engineer would with respect to safety risks of physical damage.
¶ 27 When a defendant is under a duty of care with respect to certain risks of *530 harm and admits breach, as LTK assumes here, "the connection between the breach and the plaintiff's injury becomes a factual question of proximate cause." Eastwood, at 1267, 241 P.3d 1256. The court decides whether a reasonable juror could conclude that "the plaintiff's injury was within the scope of the risks of harm, which the court has held the defendant owed a duty of care to avoid." Id. at 1265, 241 P.3d 1256. Here, we have held an engineer, such as LTK, had a duty of care with respect to safety risks of physical damage. Because no reasonable jury would find a risk of fire fell outside the scope of LTK's duty of care, proximate causation is not disputable. The simultaneous realization of a risk of harm to SMS's business expectancy is irrelevant. By itself, a breach of LTK's tort duty with respect to safety risks is sufficient to state a claim.[5]

2. Does an engineer's duty of care extend to the persons who have a property interest to use and occupy the property?

¶ 28 A duty's scope can be limited to designated classes of persons. See, e.g., ESCA Corp. v. KPMG Peat Marwick, 135 Wash.2d 820, 832, 959 P.2d 651 (1998). The issue is whether a duty of care respecting damage to property extends only to the persons who hold an ownership interest in that property.
¶ 29 LTK argues that regardless of whether SMS's property interest can be classified as a lease, a license, or some other property interest, only the owner of property can sue in tort for damage to the property. LTK's understanding of the relationship between ownership and the scope of tort duties would lead to absurd results. SMS would not be able to sue for trespass if someone occupied the monorail stations or trains without SMS's permission. SMS would not be able to sue for damages if an arsonist intentionally set the trains or stations afire. SMS would not be able to recover in a negligence suit if a truck driver on the Seattle Center grounds negligently fell asleep, lost control, and rammed into the monorail station and trains parked there. In these examples, under LTK's proposed rule, only the City, as owner, would be protected by tort law.
¶ 30 We reject LTK's argument and hold that the scope of an engineer's duty of care extends to the persons who hold a legally protected interest in the damaged property. "`Property' is made up of an infinite collection of `interests' that may be held, separated, divided, transferred, restricted combined and recombined like jackstraws." 17 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 1.1, at 3 (2d ed.2004). Accordingly, more than one person can "own" or "hold" an interest in property. See id. The law protects a wide range of property interests from harm. A license, a privilege to use property, is entitled to legal protection against interference by a third person if the license is not terminable at will or grants possession to the exclusion of the third person. Restatement of Property § 521(2)-(3) (1944).[6] An easement is a right to enter and use property for some specified purpose. 17 Stoebuck & Weaver, supra, § 2.1, at 80. A cousin of easements, a profit a prendré, "is the right to sever and to remove some substance *531 from the land." Id. "Profits are typically to remove minerals, gravel, or timber." Id. Such nonpossessory interests are entitled to legal protection against "actual or threatened harm." 2 AMERICAN LAW OF PROPERTY § 8.106, at 312 (A. James Casner, ed.1952). The holder of a nonpossessory interest does not have to hold title to the servient estate in order to sue for damage to the nonpossessory interest. See 28A C.J.S. EASEMENTS § 243, at 466 (2008) ("The owner of an easement whose right has been invaded and injured or destroyed has a right of action therefor."). As this discussion shows, property interests falling well short of a full fee simple estate are worthy of legal protection.
¶ 31 In this case, we do not need to label SMS's property interest as a lease, a license, a profit, or an easement. It is plain that the City granted to SMS "the concession right and privilege to maintain and exclusively operate the Monorail System including the facilities, personal property and equipment, together with the right to use and occupy the areas, described in this section." ER 030, Ex. 1, § III.A (emphasis added). These are property interests in using and possessing the Seattle Monorail, and thus SMS was within the scope of LTK's duty of care.[7] To be sure, the City reserved "access to the Monorail System at all reasonable times to inspect the same and to make any repair, improvement, alteration or addition thereto of any property owned by or under control of the City." ER 095, Ex. 1, § XIX.A. But a "landlord's retention of the right to enter, inspect and repair is not inconsistent with a full surrender of possession to the tenant." 49 AM.JUR.2D LANDLORD AND TENANT § 386 (2006).
¶ 32 Still, LTK asks us to view the agreement through the prism of contract. LTK argues that "SMS' obligation to pay some of the repair cost . . . was a commercial obligation it undertook by contract, not the reflection of any ownership interest in the damaged property." Resp. Br. of LTK at 17. In a narrow sense, this is true. In Washington, commercial leases usually contain a "contractual duty for either the landlord or tenant to make repairs or apportioning repair duties between the parties." 17 STOEBUCK & WEAVER, supra, § 6.39, at 367.
¶ 33 But SMS's property interest derives not from the repair provisions, but from section III.A of the agreement, which granted the "right and privilege to maintain and exclusively operate the Monorail System including the facilities, personal property and equipment, together with the right to use and occupy the areas, described in this section." ER 030, Ex. 1, § III.A (emphasis added). That the City conveyed these enumerated property interests in a contract is unexceptional, because almost all property interests must be conveyed in writing. Oftentimes, these writings include contractual obligations that define the relationship between the parties with an interest in the property and allocate responsibilities among them for caring for the property. See, e.g., 17 STOEBUCK & WEAVER, supra, § 6.4, at 316 ("[T]he act of leasing land is a conveyance, a transfer of an estate, and the various conventional undertakings that are practically always made, including the covenant to pay rent, are contractual promises."). Despite LTK's attempts to portray SMS's rights differently, SMS is not a simple third-party contractor hired by the City to maintain the monorail whenever necessary.
¶ 34 Because LTK's duty of care extended to SMS as holder of the property interests in using and possessing the Seattle Monorail, AFM properly seeks damages for the harm to property interests of SMS. Standing in SMS's shoes, AFM may claim the damages necessary to return SMS as nearly as possible to the position it would have been in, and any claimed damages for SMS's lost profits might be recoverable as damages consequential to LTK's negligence. See 16 DeWOLF & *532 ALLEN, supra, §§ 5.3-5.4, 5.9, at 174-77, 186.[8]

III. CONCLUSION
¶ 35 Applying the independent duty doctrine here, we hold that SMS may sue LTK for negligence. LTK, by undertaking engineering services, assumed a duty of reasonable care. This obligation required LTK to use reasonable care, as we have defined it, with respect to risks of physical damage to the monorail. SMS enjoyed legally protected interests in the monorail, and LTK's duty encompassed these interests. By subrogation to SMS's rights, AFM may pursue a claim for negligence against LTK. Consistent with this opinion, the answer to the Ninth Circuit's certified question is yes.
I CONCUR: SUSAN OWENS, Justice.
CHAMBERS, J. (concurring).
¶ 36 I agree with the lead opinion in result and would answer the certified question in the affirmative. This court has long recognized that engineers have a duty to exercise reasonable skill and judgment in performing engineering services. We have never held that engineers do not have a cognizable duty in tort, and I agree we should not so hold today. And I would not reexamine that duty just because the defendant has raised the independent duty doctrine as a defense to a tort claim. The lead opinion's approach suggests that this court is going to reexamine every tort duty established by common law or statute in the face of a claim that the independent duty doctrine bars the claim. While, I agree with the lead opinion's result, I would treat this case like an ordinary tort case and resolve it based upon our established tort precedent.
¶ 37 The Seattle Monorail System takes passengers between downtown Seattle and the Seattle Center. Seattle Monorail Services Joint Venture (SMS) operates the monorail under a concession agreement with the city of Seattle. Among other terms, SMS agreed to provide emergency maintenance and to bring trains back into service following an accident. LTK Consulting Services, Inc. (LTK) contracted with the city to provide engineering services relating to examining and recommending repairs to the monorail system. At least for the purposes of the certified question, there is no contractual relationship between SMS and LTK. Affiliated FM Ins. Co. v. LTK Consulting Servs., Inc., 556 F.3d 920, 922 (2009).
¶ 38 A fire damaged the blue and red trains of the monorail. SMS suffered millions of dollars in damages. Affiliated FM Insurance Co. (Affiliated), SMS's insurer, paid for damages caused by the fire. Then, standing in the shoes of SMS as its subrogee, Affiliated brought this negligence action against LTK. Affiliated contends that as part of its work, LTK recommended removing an electrical grounding system from the monorail that would have prevented the fire. Affiliated contends that this advice was negligent and that such negligence was a proximate cause of the fire and subsequent damage to its insured.
¶ 39 We largely clarified this court's independent duty jurisprudence in Eastwood v. Horse Harbor Found., ___ Wash.2d ___, 241 P.3d 1256 (2010). This case is, in my view, a straightforward claim of professional negligence. Professionals, including engineers, owe a duty to "exercise the degree of skill, care, and learning possessed by members of their profession in the community." 16 DAVID K. DEWOLF & KELLER W. ALLEN, WASHINGTON PRACTICE: TORT LAW AND PRACTICE *533 § 15.51, at 504-05 (3d ed.2006). The only issue is whether LTK owed that duty to SMS as a concessionaire. I agree with the lead opinion that it did. This case does not implicate in any way the independent duty doctrine, formerly known as the economic loss rule. Eastwood, at 1266, 241 P.3d 1256. The term "economic loss rule" was a misnomer. Id. As I note in Eastwood, "[u]nfortunately, the imprecise use of the term `economic loss rule' by this court led many to erroneously conclude that it was a rule of general application that precluded recovery in tort of virtually any harm that could be measured in dollars if a business relationship also existed between the parties." Eastwood concurrence at 1271-72. In Eastwood, we took the opportunity to clarify that the economic loss rule had been read too broadly by lower courts, adopted the term "independent duty" rule in its stead, and explained that the independent duty doctrine focused on the duty owed rather than any particular kind of damage suffered.
¶ 40 This case arose before our decision in Eastwood could be announced. Recognizing the confusion in our jurisprudence before Eastwood, the United States Court of Appeals for the Ninth Circuit certified the following question to this court:
May party A (here, SMS, whose rights are asserted in subrogation by AFM), who has a contractual right to operate commercially and extensively on property owned by non-party B (here, the City of Seattle), sue party C (here, LTK) in tort for damage to that property, when A(SMS) and C(LTK) are not in privity of contract?
Affiliated, 556 F.3d at 922. Ultimately, the question certified is one of duty. The lead opinion properly notes that engineers have long had a common law "`duty to exercise reasonable engineering skill and judgment.'" Lead opinion at 528 (quoting G.W. Constr. Corp. v. Prof'l Serv. Indus., Inc., 70 Wash. App. 360, 366, 853 P.2d 484 (1993)). Yet LTK argues that it owed no duty to SMS because SMS's losses were essentially economic. This argument is precisely the argument that we dispatched in Eastwood. Given that, the answer to the certified question is a straightforward yes. I would not reassess the policy behind the common law duty of engineers to exercise reasonable engineering skill and judgment. I concur with the lead opinion in result.
WE CONCUR: CHARLES W. JOHNSON, RICHARD B. SANDERS and DEBRA L. STEPHENS, Justices.
MADSEN, C.J. (concurring/dissenting).
¶ 41 Legal doctrines develop, and course corrections are frequently made, in response to factual circumstances that demonstrate the need for refinement of a rule of law or legal analysis. The lead opinion's new approach to the economic loss rule is more than a course correction. It is, in effect, a wholesale rejection of our prior cases. In exchange, the lead opinion substitutes an analysis that involves little more than this court's ad hoc determination of whether a duty should lie. I am not convinced that the "independent duty" approach is an improvement in determining when parties will be held to their contract remedies.[1]
¶ 42 But there is a more immediate problem with the lead opinion's analysis in this case. The lead opinion should not even engage in its "independent tort" analysis because without question, the losses that Seattle Monorail Services (SMS) suffered are not economic losses within the meaning of the economic loss doctrine and there is no basis for assuming that a choice must be made between contract and tort remedies. *534 This being the case, whether Affiliated FM Insurance Company, which is subrogated to any rights that SMS has to proceed against LTK Consulting Services, Inc., can seek a tort remedy for those losses is a matter to be decided solely under settled tort law principles without regard to the economic loss rule. The answer to the United States Court of Appeals for the Ninth Circuit's certified question is that in the circumstances of this case, the economic loss rule is not implicated at all and therefore it certainly does not apply to bar Affiliated FM's tort claims.

Analysis
¶ 43 The lead opinion mistakenly assumes that there is an issue about whether Affiliated FM, standing in its insured's SMS's shoes, is seeking relief for economic losses for which contractual remedies are available and that there is therefore a question about whether the economic loss rule applies in this case. The lead opinion says that "where a court applying Washington law is called to `distinguish between claims where a plaintiff is limited to contract remedies and cases where recovery in tort may be available,' . . . the court must apply the . . . independent duty doctrine." Lead opinion at 1261-66 (quoting Eastwood v. Horse Harbor Found., ___ Wash.2d ___, ___, 241 P.3d 1256 (2010)). But here there is no question of any contract remedies being available and the economic loss rule is not implicated at all.
¶ 44 However, inventing its own hypothetical set of facts, the lead opinion claims that it is appropriate to apply its "independent tort" analysis notwithstanding the lack of any actual contractual relationship between SMS and LTK Consulting that would implicate the economic loss rule. The lead opinion points to SMS's agreement with the city of Seattle to carry fire insurance and says that SMS could have negotiated with the city to obtain the right to contract for engineering and other repair services. Lead opinion at ___ n. 1. The lead opinion evidently believes this would sufficiently bring the case within the class of cases where both contract and tort remedies are permissible and a court accordingly must decide whether the economic loss rule bars tort remedies.
¶ 45 In the first place, the lead opinion's explanation assumes that the city would have relinquished its rights as owner of the monorail to contract for such services. SMS had only the right to operate the monorail as a concessionaire. It did not have ownership rights and nothing suggests the city would have relinquished its own rights. The lead opinion's assumption about nonexistent facts cannot substitute for SMS in actual fact having the right and responsibility to contract for engineering services.
¶ 46 In the second place, the relevant relationship is that between SMS and LTK Consulting. Not only would SMS have had to have had the right to contract for engineering, it would have had to have actually exercised this right and entered a contract with LTK Consulting. But just as nothing in the record even hints that SMS would ever have had the right to contract with LTK Consulting, it obviously never entered into any such contract with LTK Consulting. There was never any contract between SMS and LTK Consulting, never any expectations of any bargain. There simply was never any relationship between SMS and LTK Consulting, nor any recognized basis in our law for presuming circumstances that would give rise to the possibility that the economic loss rule might apply.
¶ 47 And third, the lead opinion's explanation of why the economic loss rule might be implicated perpetuates an unfortunate misreading of our decision in Alejandre v. Bull, 159 Wash.2d 674, 153 P.3d 864 (2007). Some parties and courts have taken statements and portions of that decision out of context to conclude that if a party could have contracted or negotiated a matter, then the economic loss rule is implicated. That is much too broad a principle and it has never been the law in this state, but the lead opinion does the same thing when it says that SMS could have negotiated with the city to obtain the right to contract for engineering and other repair services.
¶ 48 Alejandre provides an extended discussion of the economic loss rule as it developed prior to the "independent duty" approach favored by the lead opinion, including a discussion of why the rule exists and when *535 it is implicated. As to the latter, the Alejandre opinion can only fairly be read, when read properly as a whole, to say that in general the economic loss rule is implicated when the parties are in a contractual relationship and could or should have negotiated allocation of risks associated with the subject matter of their agreement. The losses must be economic losses for which this risk allocation could or should have been negotiated, with these losses not being in the nature of personal injury or injury to property.
¶ 49 Here, SMS simply had no contractual relationship with LTK Consulting and the economic loss rule does not apply.
¶ 50 There is not even a colorable claim that a choice must be made between contract remedies and tort remedies, and this is what the lead opinion should say. We should not engage in an analysis to decide whether the economic loss rule would apply when there is no way in which it could ever apply under the facts here.
¶ 51 One has to ask the questionif we simply presume economic losses in a case and therefore engage in the "independent tort" analysis, what happens if we find no independent tort? We certainly would not apply the economic loss rule if it is not implicated.
¶ 52 The lead opinion has the whole analysis upside down.
¶ 53 This is a huge mistake in analysis and presents an extremely distorted assumption about what constitute economic losses implicating the economic loss rule. This case is not about whether Affiliated FM will be held to SMS's contract remedies under the concessionaire agreement between the city of Seattle and SMS or about any contract remedies existing under the city's contract with LTK. It is instead about whether Affiliated FM can seek tort remedies in an action against LTK Consulting, with which SMS had no contract or, indeed, any relationship at all.
¶ 54 In general, the economic loss rule "`prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from contract'" because "`tort law is not intended to compensate parties for losses suffered as a result of duties assumed only by agreement.'" Factory Mkt., Inc. v. Schuller Int'l, Inc., 987 F.Supp. 387, 395 (E.D.Pa.1997) (quoting Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 618 (3d Cir.1995) and Palco Linings, Inc. v. Pavex, Inc., 755 F.Supp. 1269, 1271 (M.D.Pa. 1990)). This does not mean that if a loss occurs under a contract, i.e., any contract with anyone at all, then the loss is an economic loss within the meaning of the economic loss doctrine.
¶ 55 As the court has explained, the economic loss rule applies to limit recovery for economic losses to contract remedies "to ensure that the allocation of risk and the determination of potential future liability is based on what the parties bargained for in the contract." Berschauer-Phillips Constr. Co. v. Seattle Sch. Dist. No. 1, 124 Wash.2d 816, 826, 881 P.2d 986 (1994); accord Alejandre, 159 Wash.2d at 684, 153 P.3d 864. In general, if the plaintiff and the defendant do not have a contract, there has been no give and take negotiation regarding allocation of risks. Absent a contract between the parties, the economic loss rule is never implicated at all.[2]
¶ 56 Here, Affiliated FM is not suing the city of Seattle and it is not seeking remedies under the contract SMS has with the city of Seattle nor, more importantly, is it trying to avoid remedies SMS has under the contract with the city in favor of tort remedies from the city. Affiliated FM is suing LTK Consulting Services, an engineering firm with which SMS did not have a contractual relationship[3] *536 (and therefore with which it never engaged in the negotiation of risks normal in the context of a contractual undertaking).
¶ 57 The federal district court similarly failed to appreciate that the question whether the economic loss rule applies arises in this case only if there was a breach of contract between SMS and LTK Consulting. It apparently accepted LTK Consulting's argument in support of its motion for summary judgment that losses other than an injury to one's own property or person are economic losses and outside the bounds of a tort action, regardless of any contract. The district court therefore focused on the question of what kind of a property interest, if any, SMS acquired in the monorail property under the SMS-city of Seattle Monorail Concession Agreement, and concluded that the economic loss rule applies because under its contract with the city of Seattle SMS did not exercise the degree of possession and control over the trains sufficient to demonstrate ownership.
¶ 58 Certainly the nature of the injury can be important to the question since, for example, personal injuries are not within the scope of the economic loss rule. But the overarching inquiry into whether economic losses are at issue is an inquiry into whether there is a contract, breach of which is alleged to have caused the loss because, if it applies, the economic loss rule is designed to hold parties to their contract remedies rather than tort remedies.
¶ 59 A discussion of contractual risk allocation would be incomplete without addressing the construction cases, where lack of direct contractual privity does not preclude application of the economic loss rule. LTK Consulting relies heavily on one of these cases, Berschauer/Phillips, 124 Wash.2d at 822, 881 P.2d 986, but Berschauer/Phillips does not support its argument that the economic loss rule applies here. Rather, Berschauer/Phillips and the Colorado Supreme Court's decision in BRW, Inc. v. Dufficy & Sons, Inc., 99 P.3d 66, 72-73 (Colo.2004) explain why the economic loss rule is applied in the context of the interrelated disciplines and agreements that generally exist with respect to a construction project, even without direct privity between each of the design professionals, contractors and subcontractors, and inspectors that may be involved in development and construction of a building or the like. As is apparent from these cases, the nonprivity construction cases do not stand for a universal rule that privity is not required, nor do they stand for a broad rule that the nature of the property damage dictates in the first instance whether the economic loss rule applies.
¶ 60 In Berschauer/Phillips, a contractor sought to bring tort claims against an architect, a structural engineer, and an inspector, none of whom were in contractual privity with the contractor, alleging that defective design and negligent failure to inspect increased costs of construction and caused delay costs. The contractor alternatively sought to bring a tort claim for negligent misrepresentation under the Restatement (Second) of Torts § 552 (1977) for negligent misrepresentation. The court held that the economic loss rule barred the tort claims, despite the lack of direct contractual privity.
¶ 61 The court explained:
The economic loss rule marks the fundamental boundary between the law of contracts, which is designed to enforce expectations created by agreement, and the law of torts, which is designed to protect citizens and their property by imposing a duty of reasonable care on others. The economic loss rule was developed to prevent disproportionate liability and allow parties to allocate risk by contract.
. . . .
We . . . maintain the fundamental boundaries of tort and contract law by limiting the recovery of economic loss due to construction delays to the remedies provided by contract. We so hold to ensure that the allocation of risk and the determination of potential future liability is based on what the parties bargained for in the *537 contract. We hold parties to their contracts. If tort and contract remedies were allowed to overlap, certainty and predictability in allocating risk would decrease and impede future business activity. The construction industry in particular would suffer, for it is in this industry that we see most clearly the importance of the precise allocation of risk as secured by contract. The fees charged by architects, engineers, contractors, developers, vendors, and so on are founded on their expected liability exposure as bargained and provided for in the contract. . . .
A bright line distinction between the remedies offered in contract and tort with respect to economic damages also encourages parties to negotiate toward the risk distribution that is desired or customary. We preserve the incentive to adequately self-protect during the bargaining process. If we held to the contrary, a party could bring a cause of action in tort to recover benefits they were unable to obtain in contractual negotiations.
Berschauer/Phillips, 124 Wash.2d at 821, 826-27, 881 P.2d 986 (citations omitted).
¶ 62 In a similar vein, the Colorado Supreme Court also held that despite the lack of direct privity, the economic loss rule applied to bar a steel subcontractor's tort claims against an engineering firm and an inspector alleging that an improper plan and negligent inspections caused cost overruns on a public works project. The Colorado Court of Appeals had held that the economic loss rule did not preclude the tort claims because, under the "independent duty" approach, a licensed engineer owes an independent duty of care under tort law to contractors and subcontractors with regard to plans and specifications that the engineer drafted and prepared and which were relied upon by the contractor or subcontractor. The court of appeals had also held that the inspector had the same duty of care in inspecting and directing the project. The Colorado Supreme Court reversed:
[The subcontractor] argues that the application of the economic loss rule is limited to cases where the parties contracted directly with each other for their rights and obligations. [The subcontractor] claims that it did not have an "opportunity. . . to bargain directly with [the inspector] and [the engineer] over the risk of the harm which would result from defective specifications and negligent project administration." We disagree and hold that the economic loss rule applies when the claimant seeks to remedy only an economic loss that arises from interrelated contracts.
The economic loss rule applies between and among commercial parties for three main policy reasons, none of which depends upon or is limited to the existence of a two-party contract: (1) to maintain a distinction between contract and tort law; (2) to enforce expectancy interests of the parties so that they can reliably allocate risks and costs during their bargaining; and (3) to encourage the parties to build the cost considerations into the contract because they will not be able to recover economic damages in tort.
In the context of larger construction projects, multiple parties are often involved. These parties typically rely on a network of contracts to allocate their risks, duties, and remedies.
[C]onstruction projects are multi-party transactions, but rarely is it the case that all or most of the parties involved in the project will be parties to the same document or documents. In fact, most construction transactions are documented in a series of two-party contracts, such as owner/architect, owner/contractor, and contractor/subcontractor. Nevertheless, the conduct of most construction projects contemplates a complex set of interrelationships, and respective rights and obligations.
FUNDAMENTALS OF CONSTRUCTION LAW 4-5 (Carina Y. Enhada et al., eds., 2001).
In such a contract chain, the parties do have the opportunity to bargain and define their rights and remedies, or to decline to enter into the contractual relationship if they are not satisfied with it. Even though a subcontractor may not have the opportunity to directly negotiate with the engineer or architect, it has the opportunity to allocate the risks of following specified *538 design plans when it enters into a contract with a party involved in the network of contracts. In this situation, application of the economic loss rule encourages a subcontractor to protect itself from risks, holds the parties to the terms of their bargain, enforces their expectancy interests, and maintains the boundary between contract and tort law.
The policies underlying the application of the economic loss rule to commercial parties are unaffected by the absence of a one-to-one contract relationship. Contractual duties arise just as surely from networks of interrelated contracts as from two-party agreements.
BRW, Inc. v. Dufficy & Sons, Inc., 99 P.3d 66, 72-73 (Colo.2004) (some alterations in original) (citations omitted).[4]
¶ 63 Unlike Berschauer/Phillips and BRW, the present case does not involve the construction industry and the interconnectedness of related disciplines involved in constructing buildings and similar structures (or a similar commercial context involving such interconnectedness), where each entity knows of the involvement of the others and can negotiate risks by contract, including matters concerning the risks of potential liability. Instead, there was a contract between the city of Seattle and SMS, governing in great detail the operation of the monorail system. This contract is, as it is titled, a concession agreement between the city of Seattle and SMS that granted to SMS a concessionaire's right to operate the monorail system belonging to the City.
A concession agreement is akin to a lease, but distinct in that concessionaires do not take a proprietary interest in real property, but rather are given the privilege of operating in connection with governmental property under contractual terms that specify the scope of governmental permission. A concession agreement allows a private company to provide goods or services on public property that might otherwise be provided directly by government personnel.
Scott L. Cummings & Steven A. Boutcher, Mobilizing Local Government Law for Low-Wage Workers, 1 U. CHI. LEGAL F. 187, 199 (2009).
¶ 64 As an entirely separate matter, the city of Seattle contracted with LTK Consultants for that business's services. It cannot be said that operating the monorail as a *539 concessionaire, as SMS did, or doing engineering work for the city with respect to the monorail, as LTK Consulting did, contemplated a complex set of interrelationships with respective rights and obligations. There is also no evidence or even a hint of any history or practice common to either activity that is comparable to that in the construction industry, where it is routine for members of interrelated professional disciplines and contractors to engage in such a series of interconnected contractual arrangementsa process that is widely known and extremely common.
¶ 65 There is no reasonable basis for thinking that SMS should have or could have protected itself through contractual risk allocation from any alleged breach by LTK Consulting of LTK Consulting's contract with the city. SMS had no contractual relationship with LTK Consulting. There is no basis to conclude that SMS was a third-party beneficiary of the contract between LTK Consulting and the city of Seattle. SMS's losses are not remediable through any contract with defendant LTK Consulting.
¶ 66 The federal district court held that summary judgment must be granted in favor of LTK Consulting because the economic loss rule bars Affiliated FM's tort claims. It does not. Absent any contract between SMS and LTK Consulting, there is no basis to conclude that SMS's losses are economic losses within the meaning of the economic loss rule. Accordingly, on the facts here, the answer to the Ninth Circuit's certified question is that the economic loss rule does not bar Affiliated FM's tort claims. Whether there is a reason specific to tort law why such claims might be barredunrelated to the economic loss ruleis a separate question that the district court did not address.[5]

Conclusion
¶ 67 The lead opinion erroneously assumes that economic losses are at issue. The economic loss rule is premised on the principle that if the risk of loss can be allocated in a negotiated contract, then a party to that contract will be held to the contract remedies if breach of the contract results in economic losses. Affiliated FM is not suing the city and is not seeking to avoid contract remedies under SMS's contract with the city. Rather, Affiliated FM is suing LTK Consulting, an entity with which SMS has no contract. The lack of any such contract means there are no competing contract and tort remedies and no need to determine whether the economic loss rule will apply to bar claims for tort remedies.
¶ 68 The lead opinion's huge assumption leads to its lengthy and misleading analysis, which is likely to muddle the entire area of law. Parties may well believe that the economic loss rule must be considered whenever commercial parties sue each other, and this, of course, is not the case. It is unfortunate that the lead opinion also may well encourage parties to make unnecessary or unavailing arguments in the mistaken belief that the court must assume that there is a question about whether the economic loss rule applies any time there is a contract lurking anywhere in the record, regardless of the fact that it is not between the parties.
¶ 69 I would hold that the answer to the Ninth Circuit's certified question is that the economic loss rule does not bar tort claims in this case because there was no contract between LTK Consulting and SMS and no basis under the facts of this case for applying *540 the economic loss rule in the absence of contractual privity.
WE CONCUR: GERRY L. ALEXANDER, and JAMES M. JOHNSON, Justices.
NOTES
[1] The concurrence/dissent does not successfully articulate a consistent, logical rule for narrowing the sweep of the definition. First, the concurrence/dissent argues that harm is never an economic loss within the meaning of the economic loss rule unless the plaintiff and the defendant had a contract or unless the parties were contractors on the same construction job. See concurrence/dissent at 533, 536. But in Stuart v. Coldwell Banker Commercial Group, Inc., 109 Wash.2d 406, 745 P.2d 1284 (1987), an economic loss case, neither condition was present. The defendant was the builder-seller of a condominium complex, and the plaintiff was the homeowners association, which represented many subsequent purchasers who were not in contractual privity with the defendant. Id. at 411, 745 P.2d 1284. The concurrence/dissent has no answer for Stuart. Other jurisdictions have also found an economic loss even when the parties were not in contractual privity. See, e.g., Daanen & Janssen, Inc. v. Cedarapids, Inc., 216 Wis.2d 395, 413, 573 N.W.2d 842 (1998) ("[W]e conclude that the economic loss doctrine precludes a commercial purchaser from recovering in tort from a manufacturer for solely economic losses, regardless of whether privity of contract exists between the parties.").

Second, the concurrence/dissent attempts to recast Alejandre v. Bull, 159 Wash.2d 674, 153 P.3d 864 (2007), arguing that "the economic loss rule is implicated when the parties are in a contractual relationship and could or should have negotiated allocation of risks associated with the subject matter of their agreement," concurrence/dissent at 535, and argues that "[t]here is no reasonable basis for thinking that SMS should have or could have protected itself through contractual risk allocation from any alleged breach by LTK Consulting of LTK Consulting's contract with the City," concurrence/dissent at 539. Even by the concurrence/dissent's own standard, its conclusion is incorrect. The subject matter of the contract was the operation of the Seattle Monorail, and surely maintenance issues and the risks of mechanical or electrical failure are associated with that. Further, SMS agreed by contract to obtain fire insurance, and, having obtained the exclusive right to operate the Seattle Monorail, SMS could have negotiated the exclusive right to contract for engineering and other repair services. Cases like this one can be resolved only by analyzing the duties and the risks of harm involved.
[2] See also Keller v. City of Spokane, 146 Wash.2d 237, 243, 44 P.3d 845 (2002), where we explained that the issues are not only whether a person "owes the duty, but also to whom the duty is owed, and what is the nature of the duty owed. The answer to the second question defines the class protected by the duty and the answer to the third question defines the standard of care." (Citation omitted.)
[3] The concurrence/dissent asserts that the independent duty inquiry is "a wholesale rejection of our prior cases" and is "little more than this court's ad hoc determination of whether a duty should lie." Concurrence/dissent at 533. Neither accusation is correct. Our decisions in this case and in Eastwood leave intact our prior cases where we have held a tort remedy is not available in a specific set of circumstances. It is the concurrence/dissent that wishes to reject this court's cases. First, the concurrence/dissent suggests that tortfeasors can be automatically absolved of their tort liability when their misconduct breaches both a contract and a tort duty. Concurrence/dissent at ___ n. 1. This view conflicts directly with the long standing rule that a contract can limit a party's liability for breaching a tort duty only if the contract includes a conspicuous exculpatory clause that does not violate public policy. See Scott v. Pac. W. Mountain Resort, 119 Wash.2d 484, 490, 492, 834 P.2d 6 (1992). Washington law has never permitted a tortfeasor to escape tort liability for wrongful conduct just because a contract exists. "We will not overrule such binding precedent sub silentio." State v. Studd, 137 Wash.2d 533, 548, 973 P.2d 1049 (1999).

Second, the concurrence/dissent argues that a tort remedy is not available when (1) the plaintiff's damages are economic, and (2) the parties are in contractual privity or are contractors on the same construction job. See concurrence/dissent at 533, 536. As we established in Eastwood, however,
[e]conomic losses are sometimes recoverable in tort, even if they arise from contractual relationships. For instance, we recognize the torts of intentional and wrongful interference with another's contractual relations or business expectancies, Commodore v. University Mechanical Contractors, Inc., 120 Wash.2d 120, 137, 839 P.2d 314, 322 (1992); wrongful discharge in violation of public policy, Smith v. Bates Technical College, 139 Wash.2d 793, 803-04, 991 P.2d 1135 (2000); failure of an insurer to act in good faith, American States Insurance Co. v. Symes of Silverdale, Inc., 150 Wash.2d 462, 469, 78 P.3d 1266 (2003); fraudulent concealment, Obde v. Schlemeyer, 56 Wash.2d 449, 452, 353 P.2d 672 (1960); fraudulent misrepresentation, Beckendorf v. Beckendorf, 76 Wash.2d 457, 462, 457 P.2d 603 (1969); negligent misrepresentation, ESCA Corp. v. KPMG Peat Marwick, 135 Wash.2d 820, 825, 959 P.2d 651 (1998); breach of an agent's fiduciary duty to act in good faith, Moon v. Phipps, 67 Wash.2d 948, 956, 411 P.2d 157 (1966); and negligent real estate appraisal, Schaaf v. Highfield, 127 Wash.2d 17, 27, 896 P.2d 665 (1995). . . . Thus, the fact that an injury is an economic loss or the parties also have a contractual relationship is not an adequate ground, by itself, for holding that a plaintiff is limited to contract remedies.
Eastwood, at 1261, 241 P.3d 1256 (citation omitted). The concurrence/dissent's formulation of the economic loss rule would implicitly nullify these causes of action.
As discussed fully in Eastwood, at 1261-65, 241 P.3d 1256, the connection between a plaintiff's injury and the defendant's tort duties has always been at the core of our analysis. By focusing the court's attention on this ordinary tort question of whether the defendant was under an independent tort duty, we have simply restated what has always been there. The concurrence/dissent itself cites two foreign cases that recognize the key inquiry is whether the injury flows only from a breach of a contractual obligation, or whether a tort duty was breached simultaneously. See Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 618 (3d Cir. 1995) (stating that "the economic loss doctrine. . . prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract" (emphasis added)); Palco Linings, Inc. v. Pavex, Inc., 755 F.Supp. 1269, 1271 (M.D.Pa.1990) (noting that "tort law is not intended to compensate parties for losses suffered as result of a breach of duties assumed only by agreement;" "to recover in tort a plaintiff must allege facts showing a breach of some duty imposed by law"). For ages, common law courts have defined tort duties, so we do not share the concurrence/dissent's pessimism about the independent duty analysis.
[4] Nothing we say should be understood to mean that every tort duty of care should be reexamined upon a claim that a person has only contractual remedies for an injury. Rather, we inquire into the duty question here because this court has never explicitly held before that such a duty exists.
[5] LTK challenges our jurisdiction to review whether SMS's losses arose from a tortious risk of harm. LTK says the Ninth Circuit decided that "any loss suffered by SMS was a `contractually-created' economic loss, not damage to its own property." Resp. Br. of LTK at 9 (quoting Affiliated FM, 556 F.3d at 921). Because this was a "ruling not certif[ied] for consideration," LTK believes we may not address AFM's argument that SMS's losses are merely economic. Id. (quoting Affiliated FM, 556 F.3d at 921); see also id. at 30 ("The Ninth Circuit did not raise those issues in its certified question."). LTK is wrong. The Ninth Circuit did not issue a "ruling" on this point; it merely described the ways the losses could be characterized. See Affiliated FM, 556 F.3d at 921. We have jurisdiction to address the issue de novo because the Ninth Circuit has asked us whether SMS has a cause of action in tort, a purely state law question, and we cannot answer the question unless we inquire into the nature of the losses.
[6] LTK urges us to reject the Restatement's view, but we have already adopted it. See McInnes v. Kennell, 47 Wash.2d 29, 36, 286 P.2d 713 (1955). We see no reason to abandon it now, lest a license holder who meets the requirements of § 521(2)-(3) be left without a remedy should a third party wrongfully destroy the value of the license.
[7] The property interest created by an instrument poses a mixed question of law and fact. The parties' intent is a question of fact, and the legal effect of their intent is a question of law. See, e.g., Veach v. Culp, 92 Wash.2d 570, 599 P.2d 526 (1979) (railroad right-of-way deed); Barnett v. Lincoln, 162 Wash. 613, 617, 299 P. 392 (1931) (lease). When reasonable minds could reach but one conclusion on the factual issue, the court may decide the issue as a matter of law. Gossett v. Farmers Ins. Co. of Wash., 133 Wash.2d 954, 973-74, 948 P.2d 1264 (1997). We do so here.
[8] The scope of LTK's duty of care is an issue certified to us, contrary to the concurrence/dissent's argument. Concurrence/dissent at ___- 539 n. 5. Further, we must inquire into the duty's scope, rather than simply hold that an independent duty exists, as the concurrence by Justice Chambers prefers. See concurrence at 533. The Ninth Circuit broadly phrased its certified question, and the Ninth Circuit indicated that the resolution of LTK's motion for summary judgment turns entirely on our answer to the question whether "a party with a contractual right to operate commercially and extensively on another's property may bring a suit in tort against a third party for damage to that property." Affiliated FM, 556 F.3d at 922. As the Ninth Circuit recognized, "this important question of Washington tort law is not entirely settled and involves matters of policy best left to state resolution." Id. This court, therefore, must address the scope of LTK's duty of care, and not punt the issue back to the federal courts.
[1] The lead opinion's analysis posits that if a breach of contract is also a breach of an independent duty of care under tort law principles, then it is compensable under tort law. This is a significant departure from our prior understanding of the economic loss rule, which limits relief to contract remedies when losses were suffered as a result of breach of a contract. "Economic loss is a conceptual device used to classify damages for which a remedy in tort or contract is deemed permissible, but are more properly remedial only in contract." Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1, 124 Wash.2d 816, 822, 881 P.2d 986 (1994). Necessarily, therefore, the economic loss rule is not implicated unless both contract and tort remedies are potentially available, and a tort remedy is not potentially available unless a duty is found. But if finding a tort duty is equivalent to finding an "independent duty" precluding application of the economic loss rule, one can legitimately ask what is left of the economic loss rule.
[2] We have recognized that strict contractual privity is not required in the construction industry where the various design professionals and contractors are involved in planning and building a building or other structure. The specialized rule relating to the "network" of contracts in such circumstances is not implicated here. I address this issue of privity below in the text.

The economic loss rule also applies under Washington's product liability act (PLA), ch. 7.72 RCW, to exclude recovery in tort for economic losses, although the PLA does not prevent the recovery of economic losses under the Uniform Commercial Code, Title 62A RCW. See RCW 7.72.010(6); .020(2); Stanton v. Bayliner Marine Corp., 123 Wash.2d 64, 84-85, 866 P.2d 15 (1993).
[3] The lead opinion says that the contract between the city and LTK Consulting is not in the record but assumes that SMS was not a party to that contract. The Ninth Circuit's order in this case states as a fact that SMS was not a party to the contract between LTK Consulting and the city.
[4] The lead opinion claims that Stuart v. Coldwell Banker Commercial Group, Inc., 109 Wash.2d 406, 745 P.2d 1284 (1987) shows that the economic loss cases are not limited to cases where a contractual relationship exists and construction cases involving a single construction project. I am not going to pretend that all economic loss cases fall neatly into these categories because this is an area where courts across the country have not always decided cases in a cohesive manner.

Nonetheless, the primary area where the economic loss rule has been applied outside of contractual privity is in the construction context. I explain why in the text. Stuart does not undercut the explanation, but instead the court there considered the economic loss rule in a different context, that of products liability. In Stuart, the plaintiff homeowners' association sued the builder-vendor for construction defects in a condominium complex. The plaintiff sought to assert what the court called a "peculiar combination of tort and contract law, closely related to the law of products liability." Id. at 418, 745 P.2d 1284. The court explained the history of products liability and liability of manufacturers, and the difficulty of suing in the absence of strict contractual privity, noting, among other things, that this led to the distinction between tort recovery for physical injuries and warranty recovery for economic loss. Id. at 418-20, 745 P.2d 1284. The court said that "[i]n cases such as the present one where only the defective product is damaged, the court should identify whether the particular injury amounts to economic loss or physical damage." Id. at 420, 745 P.2d 1284 (emphasis added). The court identified factors to use in distinguishing whether a loss is an economic loss or physical damage and said these factors "bear directly on whether the safety-insurance policy of tort law or the expectation-bargain protection policy of warranty law is most applicable to the claim in question." Id. at 421, 745 P.2d 1284 (emphasis added). Then the court said that the nature of the defect was "that the decks and walkways were not of the quality desired by the buyers" and the injury or damage was because the decks deteriorated though exposure to weather. Id.
The court's analysis in Stuart was premised on product liability law, in accord with the plaintiff's somewhat odd argument. While the court could have simply said builders are not product manufacturers, it instead explained why even if they were considered to be, the plaintiff's claim would fail under the products liability argument that the plaintiff made.
[5] In engaging in an extended discussion of the nature of the tort duty it finds, and the damages it believes are recoverable, the lead opinion goes far beyond the question certified. In certifying its question, the Ninth Circuit clarified that if we decide that "the economic loss rule, or some other rule, bars [Affiliated FM's] suit," then it will affirm summary judgment in favor of LTK Consulting. Affiliated FM Ins. Co. v. LTK Consulting Servs., Inc., 556 F.3d 920, 922 (2009). Thus, this court should be deciding whether any doctrine bars the suit. If we do not perceive a reason that a tort suit is barred, that is all we should say. After all, this is a case being prosecuted in federal court and the federal courts are perfectly capable of applying a tort analysis. We do not have jurisdiction to do any more than answer the question asked. Broad v. Mannesmann Anlagenbau, A.G., 141 Wash.2d 670, 676, 10 P.3d 371 (2000) (when this court undertakes to answer a question certified by a federal court, the federal court retains jurisdiction over all matters except the question certified). We do not need to define the tort duty, its nature and extent, or define recoverable damages.