[No. 40974-7-II.   Division Two.   January 23, 2013.]

KEY DEVELOPMENT INVESTMENT, LLC, ET AL., *Respondents*, v.
THE PORT OF TACOMA, *Petitioner*.

4

*Dennis J. La Porte* (of *Krilich La Porte West & Lockner*), for petitioner.

*Hall Baetz* (of *Baetz Lamka Clark LLP*) and *Roger A. Leishman* (of *Davis Wright Tremaine LLP*), for respondents.

¶1 HUNT, J. — We granted interlocutory review to address the following certified issue from the trial court: Applica-

tion of the independent duty doctrine (formerly, the economic loss rule) to tort claims arising from the Port of Tacoma's negotiations to purchase real property from Key Development Investment LLC. The trial court (1) granted the Port's summary judgment dismissal of Key's tort claims for fraudulent and negligent misrepresentation and tortious interference with business opportunities; and (2) denied the Port's motion for summary judgment dismissal of Trinity Glass International Inc.'s related tort claims. The Port also asks us to "strike" references to the "Plaintiffs' Statement of Uncontested Facts—Corrected" from Key and Trinity's responding briefs.[1]

¶2 Key and Trinity argue that, independent of the real estate purchase and sale letter of intent between Key and the Port, the Port owed them a duty to be honest in its representations and dealings about the Port's need and plan to relocate its tenant from the Port's soon-to-be-condemned property onto Key's property. The Port argues that (1) the trial court should have granted summary judgment dismissal of Trinity's tort claims because Trinity was a third-party beneficiary of the Port's contract with Key; (2) the Port owed no duty to Trinity independent of this contract; and (3) the trial court's grant of summary judgment to the Port based on the economic loss rule's barring Key's tort claims should have also included summary judgment similarly barring Trinity's tort claims.

¶3 The trial court understandably "misinterpreted" the economic loss rule because, when it rendered its decision in 2010, our Supreme Court had not yet issued its *Jackowski*[2] opinion clarifying the economic loss rule and transforming it into the "independent duty doctrine."[3] Applying *Jackowski* here, we (1) reverse the trial court's summary judgment dismissal of Key's tort claims against the Port; (2) affirm the

---

[1] Reply Br. of Appellant at 2.

[2] *Jackowski v. Borchelt*, 174 Wn.2d 720, 278 P.3d 1100 (2012).

[3] *Jackowski*, 174 Wn.2d at 730.

trial court's reinstatement of Trinity's tort claims against the Port on reconsideration and its corresponding denial of summary judgment dismissal of these claims; and (3) remand to the trial court to consider (a) under *Jackowski*'s independent duty doctrine, whether the Port owed Key a duty independent of the letter of intent to sustain its tort claims, (b) whether the Port owed Trinity a duty in tort, and (c) if so, whether a genuine issue of material fact exists for Key's or Trinity's tort claims to survive summary judgment for the Port and to warrant a trial on such tort claims. We deny the Port's request to strike "Plaintiffs' Statement of Uncontested Facts—Corrected."[4]

## FACTS

### I. Negotiations and Letter of Intent for Port's Purchase of Key's Property

¶4 At the time of the negotiations at issue here, Key Development Investment LLC and Trinity Glass International Inc. were "affiliates, sharing [some] common ownership"[5] and management: Ki and Jong Ham owned Trinity; Ki and Jong Ham, Tim Bang, and Chang Choi owned Key. Alexander C. Lee was vice president and chief financial officer of Trinity; and Chong So was Trinity's in-house counsel. Both Lee and So, however, helped manage Key and acted on Key's behalf in dealings with the Port.

¶5 Key owned property in the Frederickson Industrial Area of Pierce County. In 2007, Trinity was Key's tenant on this property, although Trinity did not use the entire site. Trinity wanted Key to sell or to lease it the property to eliminate or to reduce Trinity's rent payments to Key. On April 24, 2007, attempting to alleviate Trinity's rent obli-

---

[4] Reply Br. of Appellant at 2.

[5] Clerk's Papers (CP) at 37.

gations, Key entered into a listing agreement with Colliers International to lease a portion of the property to another prospective tenant.

## A. Port's Plans To Obtain Superlon and Key Properties

¶6 In mid-2007, the Port was planning the "East Blair Project"[6]—an $850 million redevelopment of the "Blair Peninsula container terminal" to accommodate a major new tenant. Clerk's Papers (CP) at 1691. In August, the Port initiated condemnation proceedings against nearby property owned by Superlon Plastics Company Inc., identifying the Superlon property as "necessary" and "critical" for the Port's redevelopment project. CP at 1148-49. The Port later entered into direct negotiations with Superlon to acquire this property for the East Blair Project's road and rail infrastructure.

¶7 Despite its plan to condemn the Superlon property for the East Blair Project, the Port wanted to retain Superlon's jobs in the Tacoma area, so it sought another location near the Port where it could relocate Superlon. As a result, in September, Robert Hacker, a commercial real estate broker with CB Richard Ellis, "approached Key about the possibility of selling [its property] to the Port"[7] and obtained permission from Key to approach the Port about buying the Key property for Superlon's relocation.

¶8 According to Trinity and Key's in-house counsel, So, the Port represented to Key, Trinity, and the real estate brokers that (1) the Port's condemnation of the Superlon property for the East Blair Project was a *certainty*, (2) Superlon *must be relocated*, and (3) Key's property was the *only available property* that could accommodate Superlon's physical needs and the Port's timing requirements. Jack Hedge, the Port's property manager responsible for acquir-

---

[6] CP at 335.

[7] CP at 156.

ing property for Superlon's relocation, did not deny having told Key and Trinity that *acquiring Key's property was a "certainty"*; and he acknowledged that "in conversation . . . about the . . . various sites . . . , that would have been a point [discussed]." CP at 1233 (emphasis added).

¶9 Nevertheless, by November, Port real estate director Bob Emerson told an East Blair Project road and utilities manager that he "wanted a design for keeping road and rail and utilities off Superlon."[8] But the Port did not tell Key that it might try to avoid acquiring the Superlon property for the East Blair Project infrastructure or that it might not need the Key property for Superlon's relocation.

¶10 Around this time, Key received an independent November 27, 2007 letter of intent from Harvey Widman and Assigns, wanting to purchase the Key property for $32.8 million.[9] With Key's authorization, CB Richard Ellis brokers disclosed to the Port Widman's offer to purchase Key's property and represented to the Port that Key would sell its property to the Port for $35 million. The next month, December, the Port's representatives told So (acting for Key) that the Port would be willing to pay $35 million for Key's property. Hedge, from the Port, and a Superlon owner inspected Key's property. On December 19, CB Richard Ellis senior associate John Bauder e-mailed So (Key's in-house counsel) that (1) Jay Stewart (the Port's real estate manager) had said the Port was "very, very interested" in purchasing Key's property; and (2) although interested, the Port "just can't seem to get out of their own way." CP at 1688.

¶11 Meanwhile, the Port had adjusted the estimated cost of acquiring the Superlon property from $3.3 million to $7.5 million. And estimates of the environmental cleanup costs

---

[8] CP at 807.

[9] Widman initially offered approximately $27 million for Key's property, which Key orally rejected. When Widman thereafter submitted his nonbinding letter of intent offering $32.8 million for the Key property, Key did not respond; and Widman "considered it a dead issue within a matter of a few weeks." CP at 344.

associated with preparing the Superlon property for the East Blair Project infrastructure had increased from $50,000 to $1,500,000. If the Port was reconsidering its decision to pursue the Superlon property and, consequently, its need to purchase Key's property for Superlon's relocation, the Port did not disclose its misgivings to Key. Instead, the next month, on January 9, 2008, Port real estate manager Stewart sent Key's broker, Bauder, the first draft of what would later become the Port's letter of Intent to Purchase and Right of Entry (LOI).

¶12 During a January 14, 2008 meeting, however, Key's part-owner Ki Ham told Port real estate director Emerson that Key's property was not for sale; Emerson responded, "Good, because *we don't want to have to buy it.*" CP at 264 (emphasis added). But Ki Ham also told Emerson that Key would be willing to sell the property to the Port for around $35 million. According to Trinity and Key's in-house counsel, So, at this meeting, the Port (through Emerson) reiterated its representations about the Port's need for Key's property.

¶13 By this time, the Port's design team had developed a "suite of many concepts" for the East Blair Project that bypassed the Superlon property; if adopted, these concepts would eliminate the Port's need to buy the Key property for Superlon's relocation. CP at 1522. By mid-February, the Port had developed plans that avoided the Superlon site altogether. Again, the Port did not inform Key about this potential change of plans, negating its need to buy Key's property.

¶14 Instead, between January 9 and March 19, Key and the Port exchanged several different iterations of what would eventually become the LOI, which by March 24, 2008, both parties had signed. The LOI listed a purchase price of $35 million for the Key property. The LOI terms (1) required the Port to pay Key a nonrefundable $10,000 deposit; (2) gave Key and the Port 30 days to "reach a

mutually acceptable Purchase and Sale Agreement";[10] (3) gave the Port 90 days to "satisfy itself, in [its] sole discretion regarding the legal and physical condition of the subject Property";[11] and (4) contained a statement that the Port "acknowledges that lease negotiations are currently pending for certain portions of [Key's] Property under a listing agreement made between the Seller and Collier's [sic] International." CP at 93. This March 24, 2008 LOI[12] and an earlier September 2007 confidentiality agreement were the only written agreements between the Port and Key; neither written agreement involved Trinity.[13]

B. Key's Forbearance from Leasing Property Pending Sale to Port

¶15 Meanwhile, on March 15, 2008, Colliers International had presented Key with a proposal from MetalTech to lease approximately 45,742 square feet of Key's property for 62 months. Although initially interested, MetalTech eventually lost interest in leasing Key's property. On April 3, Colliers International presented Key with a second proposal—for mkConstructs to lease 83,041 square feet of Key's property for 38 months. According to in-house counsel, So, Key did not enter into a lease with either mkConstructs or MetalTech, in part, because the Port had demanded that any lease of Key's property be short term.[14]

---

[10] CP at 94.

[11] CP at 91.

[12] The LOI did not include an integration clause.

[13] The LOI merely mentioned Trinity as follows: "Buyer and Seller shall have 30 days from mutual execution of this Agreement to negotiate and execute a [purchase and sale agreement] that includes a mutually agreed schedule for Trinity Glass to vacate their premises." CP at 91.

[14] Both MetalTech and mkConstructs representatives, however, later denied that Key ever broached the subject of shorter term leases.

## C. Port's Continued Negotiation To Purchase Key's Property

¶16 On April 15, Key's broker, Bauder, sent an e-mail to Stewart, Emerson, and Port counsel Ralph Klose stating that Key wished to "stick" to the previously agreed 30-day schedule for entering into a purchase and sale agreement. CP at 893. Bauder's e-mail to the Port also contained the following message:

> If the real issue is that the Port does not want to enter into a [purchase and sale agreement] until you feel more comfortable with the transaction, then we should let the owner know that. *Based on updates and requests that the Port has given us over the last 3 weeks, the seller has taken steps to accommodate the Port as far as not putting new tenants into the property and getting ready to possibly move out of the main building sooner than what was originally proposed. . . .*
>
> If the Port does want to proceed to a signed [purchase and sale agreement], but everyone is just to[o] busy to draft a document or at least send a blank document, then we will do whatever we can to help. I have offered this before several times and was told to hold off. . . . Let us know today what you think and we will go from there.

CP at 893 (emphasis added).

¶17 That same day, Klose sent Bauder a reply stating simply, "Attached is a more recent Port form; please work from this one"; he attached the Port's standard blank purchase and sale agreement, but his e-mail contained no further instruction or explanation. CP at 867. After receiving these terse comments from the Port, Bauder sent a draft purchase and sale agreement to Key on April 16. Key (1) determined that the draft was "not transaction-specific, and was fundamentally contrary to the express and narrow contingency provisions of the [LOI]"; and (2) concluded that the Port had not put forth its "boilerplate form" draft purchase and sale agreement in good faith. CP at 160.

¶18 Key's in-house counsel, So, asked Bauder "to go back and find out the real reason for the Port's delay and the Port's failure to produce a [purchase and sale agreement] in accordance with the [LOI]." CP at 160. On the evening of April 23 (the 30th and last day to reach a purchase and sale agreement under the LOI), Bauder sent Stewart an e-mail confirming the details discussed earlier in the day and stating that Key would "be willing to sign a mutually acceptable [purchase and sale agreement] once contingencies have been removed." CP at 130. Stewart responded the next day, stating that (1) removing contingencies was "a significant change of agreed terms and a significant obstacle," and (2) the Port was waiting for "the remaining diligence information on the property and leases which [Key] agreed to provide the Port last month [in the LOI]." CP at 130. According to Bauder, he complied with the terms of the LOI by sending materials when requested; but the Port never requested any materials until Bauder put pressure on them for a purchase and sale agreement.[15]

## D. Termination of the Port and Key's LOI

¶19 On April 24, 2008, the LOI terminated on its own terms. Key and the Port met a few days later, "on or about" April 29. CP at 160. Emerson, the main speaker for the Port, assured Key that the Port's purchase of Key's property would be completed. For the first time, however, Emerson noted that the Port needed to bring in another tenant or "user" to share Key's property with Superlon to make the project look better when presenting it to the Port Commissioners; thus, Key's in-house counsel, So, first learned that

[15] The LOI provided, "Within five (5) days from the date of mutual execution of this Agreement Seller shall deliver to Buyer copies of all surveys, studies, reports, leases, and all other agreements and all other materials relating to the Property reasonably requested by Buyer and in Seller's possession." CP at 92. But the LOI also required Key to provide copies of seven listed categories of documents (not conditioned on the Port's requesting such documents), which included leases, environmental reports, and other materials that could be characterized as "surveys, studies, reports, [or] leases." CP at 92.

the Port's acquisition of the Key property was contingent on finding other "user[s]" for the Key property.[16] CP at 160-61.

¶20 Into May, the Port continued to represent to Bauder that the Port needed Key's property for Superlon's relocation. On May 8, a Port representative sent an internal e-mail to other Port employees explaining that the Port had decided to stop pursuing acquisition of the Superlon property; the Port, however, did not provide this new information to Key. On May 21, the *Tacoma News Tribune* ran a story quoting Emerson as saying that there was a "chance" the Superlon property "might not be needed" for the East Blair Project. CP at 161. In response, So asked Bauder to contact Stewart to check on the *Tribune* story's accuracy. Stewart responded to Bauder that the Tribune report was not accurate and that the Port still intended to relocate Superlon to Key's property. Later, however, Emerson told Bauder that the Port had withheld from Key and Trinity information that the Superlon property might not be needed because Emerson was concerned that Key might be selling the property[17] to another buyer.

¶21 Ultimately, the Port and Key did not enter into a purchase and sale agreement. The Port did not buy Key's property. Key was not able to sell the property to its other potential purchaser. And Trinity remained on the property as Key's lessee.

---

[16] In contrast, it was "[Emerson's] understanding that the brokers and the principals knew that the Port had indicated, 'We cannot do this deal alone. We need these other coalition members to[o]'—'in order for us to move forward.'" CP at 634.

[17] In his deposition, Bauder answered "yes" to a question about whether Emerson had told him that he (Emerson) was worried that "Trinity" possibly would sell to "somebody else." CP at 1390-91. From the context, however, it is likely that counsel and Bauder meant to refer to "Key" as possibly selling to somebody else, not Trinity, which leased, but did not own, the property.

14

## II. Procedure

### A. Trial Court

¶22 Key and Trinity sued the Port, alleging various contract and tort claims and alternative legal theories, including economic tort claims for tortious interference with business expectancies, fraudulent misrepresentation, and negligent misrepresentation. The Port moved for summary judgment dismissal of Key's and Trinity's tort claims as barred by the economic loss rule and, alternatively, for lack of a genuine issue of material fact.[18] On May 28, 2010, the trial court granted the Port's motion, initially dismissing both "[p]laintiffs' tort claims as a matter of law because the economic loss rule limits [p]laintiffs to their contract remedies." CP at 1044. The trial court reasoned that (1) "[t]he economic loss rule serves to limit parties to their contract remedies when a loss potentially implicates both tort and contract relief";[19] (2) the parties had a contract in the form of the LOI; (3) the loss involved was purely an "economic one, as distinguished from personal injury or injury to other property";[20] and (4) because the loss did not relate to personal injury or other property, no exception to the economic loss rule applied and the parties were limited to their contractual remedies.[21]

¶23 Trinity moved for partial reconsideration, asserting that the economic loss rule did not bar its claim because it was not party to a contract with the Port. The Port countered that because Trinity was a third-party beneficiary of

---

[18] The Port also moved for summary judgment dismissal of plaintiffs' contract claims, which motion the trial court denied. This ruling is not before us in the instant interlocutory appeal; rather, the contract claims remain for trial on remand after we resolve the certified economic loss rule issues.

[19] CP at 1042.

[20] CP at 1043-44.

[21] The trial court did not address whether it should alternatively dismiss the plaintiffs' claims for failure to establish a genuine issue of material fact.

the Port's contract with Key, the economic loss rule also barred Trinity's tort claims against the Port. The trial court ruled that (1) the Port had not timely raised the "idea that the third-party beneficiary somehow applies in this case"; and (2) even if the Port had timely raised the third-party beneficiary concept, the trial court's ruling would not change because Trinity did not "have an opportunity to allocate risk so the economic loss rule could not apply." Verbatim Report of Proceedings (VRP) (June 18, 2010) at 13. On June 18, 2010, the trial court granted Trinity's motion for partial reconsideration and ordered, "Trinity's tort claims shall not be dismissed under the economic loss rule."[22] CP at 1088.

## B. Interlocutory Discretionary Review

¶24 The trial court certified for our review the issue of whether the economic loss rule barred Key's and Trinity's tort claims against the Port. The Port petitioned for interlocutory discretionary review of the trial court's June 18, 2010 order reinstating Trinity's tort claims. Key and Trinity jointly cross petitioned for review of the economic loss rule issues related to the trial court's May 28, 2010 summary judgment dismissal of Key's tort claims against the Port and its June 18, 2010 order reinstating Trinity's tort claims against the Port. Our court commissioner granted discretionary review of the trial court's summary judgment rulings on these tort claims; the trial court then stayed the contract claims pending below. On June 27, 2012, we ordered supplemental briefing, asking the parties to address newly issued Supreme Court decisions discussing the independent duty doctrine.

---

[22] At the time the trial court ruled on these motions in 2010, the Washington Supreme Court had not yet issued its later economic loss rule and independent duty doctrine opinions in *Eastwood v. Horse Harbor Foundation, Inc.*, 170 Wn.2d 380, 241 P.3d 1256 (2010) and *Affiliated FM Insurance Co. v. LTK Consulting Services, Inc.*, 170 Wn.2d 442, 243 P.3d 521 (2010); and in *Elcon Construction, Inc. v. East Washington University*, 174 Wn.2d 157, 273 P.3d 965 (2012) and *Jackowski*, 174 Wn.2d 720.

16

## ANALYSIS

¶25 At the outset, we note that the parties disagree about whether the *Eastwood*[23] and *Affiliated*[24] decisions *replaced* the former economic loss rule with a "new" independent duty doctrine or whether those decisions simply *renamed* the former economic loss rule. In our view, the Supreme Court's newly articulated independent duty doctrine in *Jackowski* presents a significant shift in the analysis we must undertake in reviewing whether the trial court here properly applied the former economic loss rule and whether we must remand for the trial court to reconsider the facts and its ruling within this new independent duty doctrine framework.[25] Based on *Jackowski*'s holding that the independent duty doctrine more accurately captures the principle behind the former economic loss rule, we hold that, under *Eastwood*, *Affiliated*, and *Jackowski*, the independent duty doctrine does not bar Key or Trinity from asserting their respective tort claims against the Port.

### I. FORMER ECONOMIC LOSS RULE; CURRENT INDEPENDENT DUTY DOCTRINE

¶26 The Port argues that (1) *Eastwood* and *Affiliated* "renamed the economic loss rule,"[26] leaving the Supreme Court's earlier decisions under the former economic loss rule intact; (2) Trinity was a third-party beneficiary of the Port's contract with Key, thus making "any remedies [Trinity] possessed . . . contractual"[27] and resulting in the Port's

---

[23] *Eastwood v. Horse Harbor Found., Inc.*, 170 Wn.2d 380, 241 P.3d 1256 (2010).

[24] *Affiliated FM Ins. Co. v. LTK Consulting Servs., Inc.*, 170 Wn.2d 442, 243 P.3d 521 (2010).

[25] The Supreme Court decided *Jackowski* after the parties filed their briefs in the instant case.

[26] Br. of Appellant at 13.

[27] Br. of Appellant at 13.

owing no tort duty to Trinity; and (3) "[n]o Washington court has ever found that a potential buyer of real property owes the seller any duty regarding representations about the potential buyer's intention to purchase the property." Reply Br. of Appellant at 44. Disagreeing with the Port's characterization of the independent duty doctrine, Key and Trinity argue that (1) the independent duty doctrine replaces the former economic loss rule; (2) the independent duty doctrine does not bar tort claims merely because "a case involves economic harms or contractual relationships";[28] (3) instead, "each of [their] three common law claims has long been recognized in Washington"[29] by our Supreme Court; and (4) these common law tort claims provide remedies for plaintiffs suffering "purely financial losses" independent of contractual relationships. Br. of Resp'ts at 20.

## A. Evolution of Economic Loss Rule

¶27 We first address the relevant Supreme Court cases in chronological order, ending with its most recent *Jackowski* decision.[30]

### 1. Former economic loss rule: *Alejandre* (2007)

¶28 Before it decided *Eastwood* and *Affiliated*, our Supreme Court had described the former economic loss rule in *Alejandre v. Bull* as "appl[ying] to hold parties to their contract remedies when a loss potentially implicates both tort and contract relief."[31] The Court held that the economic

---

[28] Br. of Resp'ts at 2.

[29] Br. of Resp'ts at 20.

[30] Our Supreme Court recently examined preliminary agreements in *P.E. Systems, LLC v. CPI Corp.*, 176 Wn.2d 198, 289 P.3d 638 (2012). The focus of our case here, however, is not on the enforceability of a LOI preliminary agreement, but rather on whether the Port breached an actionable duty in tort "independent" of such an agreement.

[31] *Alejandre v. Bull*, 159 Wn.2d 674, 681, 153 P.3d 864 (2007). The *Alejandre* court explained:

loss rule barred a real property buyer's negligent misrepresentation claim against the seller for failure to disclose a defective septic system because the system was "within the scope of the parties' contract." *Alejandre*, 159 Wn.2d at 677.[32]

### 2. New independent duty rule: *Eastwood*, *Affiliated*, *Elcon*, *Jackowski*

¶29 On November 4, 2010, our Supreme Court decided *Eastwood* and *Affiliated*. Although the Court rendered split decisions in both cases, together, they established the "new" independent duty doctrine, which our Supreme Court later refined in *Elcon*[33] and *Jackowski*.[34] *Jackowski*, 174 Wn.2d

---

The key inquiry is the nature of the loss and the manner in which it occurs, i.e., are the losses economic losses, with economic losses distinguished from personal injury or injury to other property. If the claimed loss is an economic loss, and no exception applies to the economic loss rule, then the parties will be limited to contractual remedies.

*Alejandre*, 159 Wn.2d at 684. The Court held, "Where economic losses occur, recovery is confined to contract 'to ensure that the allocation of risk and the determination of potential future liability is based on what the parties bargained for in the contract.'" *Alejandre*, 159 Wn.2d at 682-83 (quoting *Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1*, 124 Wn.2d 816, 826, 881 P.2d 986 (1994)). Summarizing the economic loss rule, the Court stated:

> In short, *the purpose of the economic loss rule is to bar recovery for alleged breach of tort duties where a contractual relationship exists and the losses are economic losses*. If the economic loss rule applies, the party will be held to contract remedies, regardless of how the plaintiff characterizes the claims.

*Alejandre*, 159 Wn.2d at 683 (emphasis added).

[32] Three years later, our Supreme Court distinguished *Alejandre* on the following basis, which also serves to distinguish *Alejandre* from the instant case: The *Alejandre* parties' extensive sales contract had modified the duty to disclose otherwise imposed by law. *Eastwood*, 170 Wn.2d at 389-90, 415-16. Here, in contrast, (1) Key and the Port never entered into a completed real estate contract or sale; (2) unlike the *Alejandre* contract's significant disclosures related to the misrepresentation at issue, the Port and Key's LOI contained no significant disclosures about the Port's need for either Superlon's or Key's property, the basis of Key's tort claims; and (3) unlike the completed contract in *Alejandre*, the Port and Key's LOI was not comprehensive enough to "modif[y] the duty to disclose imposed by law." *Eastwood*, 170 Wn.2d at 389-90, 415-16.

[33] *Elcon Constr., Inc. v. E. Wash. Univ.*, 174 Wn.2d 157, 273 P.3d 965 (2012).

[34] We note, however, that *Elcon*'s fraudulent inducement and intentional interference claims failed because they were factually insufficient. *Elcon*, 174 Wn.2d at 165-166, 169. Thus, the Supreme Court's discussion of whether the

at 730-31; *Elcon*, 174 Wn.2d at 165; *Affiliated*, 170 Wn.2d at 449; *Eastwood*, 170 Wn.2d at 402.

## a. *Eastwood*

¶30 Despite the existence of contractual lease covenants "obligating Horse Harbor to maintain the farm and to return it to Eastwood in good condition," lessor Eastwood brought a tort claim for waste against lessee Horse Harbor. *Eastwood*, 170 Wn.2d at 383. The Supreme Court ruled that because the duty not to commit waste was independent of the lease, Eastwood could recover tort damages from her lessee.[35] *Eastwood*, 170 Wn.2d at 383. In his concurrence, however, Justice Chambers, joined by three justices, admonished, "This court may . . . decide whether a duty is cognizable in tort"; and, once it does, "it is for this court to decide if the tort duty should no longer apply to certain circumstances or events." *Eastwood*, 170 Wn.2d at 408 (Chambers, J., concurring). Justice Fairhurst's lead opinion combines with Justice Chambers' concurrence to comprise a majority of justices agreeing in *Eastwood* that the independent duty doctrine does not bar a tort claim merely because

independent duty doctrine barred *Elcon*'s claims is arguably nonbinding dicta; nevertheless, the Supreme Court's reasoning in *Elcon* enlightens lower courts' reading of its split decisions in *Eastwood* and *Affiliated*.

[35] In a three-way split decision, however, the Supreme Court noted that before *Eastwood*, a "broad reading" of the former economic loss rule was "understandable," resulting from some of the statements in *Alejandre*. *Eastwood*, 170 Wn.2d at 387. Having clarified the former economic loss rule, Justice Fairhurst's lead opinion, in which two justices joined, then set out the independent duty doctrine:

> Where this court has stated that the economic loss rule applies, what we have meant is that considerations of common sense, justice, policy, and precedent in a particular set of circumstances led us to the legal conclusion that the defendant did not owe a duty. When no independent tort duty exists, tort does not provide a remedy.

*Eastwood*, 170 Wn.2d at 389. Justice Fairhurst's lead opinion further explained that the Court at times "recognize[s] the torts of intentional and wrongful interference with another's contractual relations or business expectancies . . . fraudulent misrepresentation[, and] negligent misrepresentation," *even if plaintiff suffers economic losses arising from a contractual relationship. Eastwood*, 170 Wn.2d at 388 (citations omitted).

a contract, or other opportunity to allocate risk, also exists between the parties, as long as the tort claim arises independently of the contract or other similar relationship.

### b. *Affiliated*

¶31 Issued the same day, *Affiliated*'s analysis relied on *Eastwood. Affiliated,* 170 Wn.2d at 448. Again writing the lead opinion, Justice Fairhurst, joined by one justice, outlined why a broad reading of the economic loss rule was incorrect.[36] *Affiliated,* 170 Wn.2d at 448. Reading *Affiliated*'s lead opinion and Justice Chambers' concurrence together, it appears that as of 2010, a majority of our Supreme Court justices agreed that the independent duty doctrine should not bar a tort claim where an existing right to such relief has been established by the Court, despite the existence of a contract between the parties.

### c. *Elcon* (2012)

¶32 Two years later, a majority of our Supreme Court adopted the independent duty doctrine: The Court reviewed the superior court's economic loss rule dismissal of Elcon's tort claims for damages after related drilling contract claims were resolved by mandatory arbitration.[37] *Elcon,* 174 Wn.2d at 160, 165. Most instructive here, the Supreme Court expressly re-admonished:

---

[36] In her lead opinion, Justice Fairhurst ultimately concluded that, despite there not being privity of contract between monorail *operator* Seattle Monorail Services (SMS) and the engineering firm responsible for *maintaining* the monorail (LTK Consulting, under contract with monorail *owner* City of Seattle), the independent duty doctrine allowed SMS's tort action against LTK for negligence that contributed to a monorail fire because LTK owed a general duty of reasonable care when it performed monorail engineering and maintenance services. *Affiliated,* 170 Wn.2d at 454. Justice Chambers again concurred, asserting that the case could be resolved based on existing tort precedent for a claim of professional negligence. *Affiliated,* 170 Wn.2d at 461-62 (Chambers, J., concurring).

[37] The Court reiterated that the independent duty doctrine more accurately captures the principle behind the former economic loss rule: " 'An injury' . . . 'is remediable in tort if it traces back to the breach of a tort duty arising independently of the terms of the contract.' " *Elcon,* 174 Wn.2d at 165 (quoting *Eastwood,* 170 Wn.2d at 389).

[I]n *Eastwood* we directed lower courts not to apply the [independent duty] doctrine to [bar] tort remedies "unless and until this court has, based upon considerations of common sense, justice, policy and precedent, decided otherwise."

*Elcon*, 174 Wn.2d at 165 (quoting *Eastwood*, 170 Wn.2d at 417 (Chambers, J., concurring)). Consistent with this apparent reluctance to apply the independent duty doctrine to bar tort claims (at least outside real property sales and construction contexts), the Court further noted that it (1) had not applied the independent duty doctrine previously to bar a claim for fraud; and (2) found "no compelling reason, whether based on common sense, justice, policy, or precedent, to bar Elcon's fraud or tortious interference claim."[38] *Elcon*, 174 Wn.2d at 166.

### d. *Jackowski* (2012)

¶33 The Jackowskis bought their home from the Borchelts but later sued them after a landslide damaged their home. *Jackowski*, 174 Wn.2d at 724-25. The Jackowskis sought damages for fraud and negligent misrepresentation from the Borchelts, based primarily on disclosures that the Borchelts had made about landslides, land slippage, and material property defects; one fraud claim was also based on allegations that the property contained undisclosed landfill. *Jackowski*, 174 Wn.2d at 724-25. The Supreme Court held that (1) even in the real estate sale context, the duty not to commit fraud is independent of the purchase and sale contract; (2) therefore, the independent duty doctrine permitted the plaintiff purchasers to pursue a fraud claim against the sellers, regardless of whether the

---

[38] Despite holding that "the economic loss rule has no application under the facts of this case," the Supreme Court affirmed dismissal of the tort claims on grounds other than the independent duty rule, which the trial court and Court of Appeals had applied to bar the claims, "[b]ecause Elcon's tort claims factually fail." *Elcon*, 174 Wn.2d at 160, 165.

parties had entered into a contract;[39] and (3) similarly, the independent duty doctrine allows plaintiffs to bring negligent misrepresentation claims, "but only to the extent the duty to not commit negligent misrepresentation is independent of the contract."[40] *Jackowski*, 174 Wn.2d at 738.

## B. Application of Independent Duty Doctrine to Key's and Trinity's Tort Claims

### 1. Standards of review

¶34 Appellate courts review de novo a grant or denial of summary judgment by performing the same inquiry as the trial court. *Hisle v. Todd Pac. Shipyards Corp.*, 151 Wn.2d 853, 860, 93 P.3d 108 (2004). Trial courts properly grant summary judgment when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Morin v. Harrell*, 161 Wn.2d 226, 230, 164 P.3d 495 (2007).[41]

■ ¶35 Appellate courts review for abuse of discretion trial court decisions granting or denying a motion for reconsideration. *Drake v. Smersh*, 122 Wn. App. 147, 151, 89 P.3d 726 (2004). A trial court abuses its discretion when its decision is manifestly unreasonable or rests on untenable reasons or grounds. *In re Marriage of Littlefield*, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997).

---

[39] The Supreme Court reiterated that the Jackowskis would need to establish their right to rely on the Borchelts' representations, but that genuine issues of material fact remained; therefore, the trial court erred in granting summary judgment on the Jackowskis' fraud claims. *Jackowski*, 174 Wn.2d at 738, 739-40.

[40] This statement, although enlightening, appears to be nonbinding dicta because the Jackowskis did not cross appeal the Court of Appeals' dismissal of their negligent misrepresentation claims. Thus, whether the independent duty doctrine applies to negligent misrepresentation claims was not before the Court in *Jackowski*. 174 Wn.2d at 728-29.

[41] We may affirm a summary judgment "upon any theory established by the pleadings and supported by the proof, even if the trial court did not consider it." *LaMon v. Butler*, 112 Wn.2d 193, 200-01, 770 P.2d 1027 (1989).

## 2. Potential Port independent duties to Key and Trinity

¶36 The Port argues that "[t]he trial court dismissed the tort claims of *both* Trinity and Key based . . . upon its finding that no exception to the economic loss rule applied," which finding is "tantamount to a finding that the Port owed no tort duties to either Key or Trinity." Reply Br. of Appellant at 14-15. We disagree with the Port's latter assertion.

¶37 The trial court did not decide whether the Port owed, and then violated, tort duties to Key or Trinity, independent of Key's contract negotiations with the Port. Rather, the trial court ruled only that the Supreme Court's then existing iteration of the economic loss rule barred Key's tort claims against the Port and, therefore, Key was limited to its contract claims against the Port (which have not yet been litigated). Although the trial court rejected the Port's third-party contract beneficiary characterization of Trinity in ruling that the economic loss rule did not bar Trinity's tort claims, the trial court did not decide whether the Port owed a duty in tort to Trinity or whether Trinity had stated a viable tort claim against the Port for breach of such a duty.[42]

¶38 In dismissing Key's tort claims and granting Trinity's reconsideration motion to reinstate its tort claims, based on its understanding of the economic loss rule, the trial court appears to have relied on two factors: (1) the existence of a contract between the Port and Key, which presented those two parties an "opportunity to allocate risk," but no such opportunity for Trinity; and (2) the economic nature of the resulting damages. VRP (June 18, 2010) at 13. The trial court's rationale for granting sum-

---

[42] Instead, the trial court certified to us, and we accepted review of, the narrow issue of whether the economic loss rule barred Key's and Trinity's tort claims against the Port. This interlocutory appeal thus left in abeyance the other issues until such time as we resolve the threshold economic loss rule issue and remand the case to the trial court.

mary judgment against Key and for granting Trinity's motion for reconsideration was based on an understandable reading of the former economic loss rule as articulated at that time.

■ ¶39 That understanding, however, is no longer correct under the Supreme Court's later decisions in *Eastwood, Affiliated,* and *Jackowski.* According to these more recent decisions, the trial court cannot automatically dismiss Key's tort claims against the Port based solely on the existence of a contract between them; instead, it must determine whether the Port's alleged breaches of claimed tort duties arose independently of the contract terms and it must do so on summary judgment taking the facts in the light most favorable to Key, regardless of the likelihood that Key would ultimately prevail on those claims at trial. *Eastwood,* 170 Wn.2d 380; *Affiliated,* 170 Wn.2d 442; *Jackowski,* 174 Wn.2d 720. Here, the trial court has not yet made such determinations.

### a. Key's tort claims against the Port

■ ¶40 As the Port correctly notes,

> The trial court made no finding that any independent tort duty ran from the Port to Key, made no finding that there were any genuine issues regarding breach of any such duty, and dismissed Key's tort claims because, inter alia, there was no exception to the economic loss rule.

Reply Br. of Appellant at 35 (citing CP at 1044). But, contrary to the Port's assertion, the record does not show that the trial court's finding no exception to the economic loss rule for Key's tort claims was "tantamount to a finding that the Port owed no tort duties."[43] Reply Br. of Appellant at 14-15. Thus, we review de novo the trial court's application of the economic loss rule under the Supreme Court's

---

[43] But even if the trial court had so ruled, the propriety of such a ruling would be beyond the limited scope of our review in this interlocutory appeal.

later recharacterization of this rule and its transformation into the independent duty doctrine.

¶41 As we have already noted, the *Elcon* court directed lower courts not to apply the independent duty doctrine to bar tort claims, despite the existence of a contract between the parties, " 'unless and until' " the Supreme Court has " 'decided otherwise.' "[44] *Elcon*, 174 Wn.2d at 165 (quoting *Eastwood*, 170 Wn.2d at 417 (Chambers, J., concurring)). Despite previous Supreme Court rulings suggesting that the former economic loss rule barred tort claims related to real estate and construction contracts,[45] in recent opinions the Court has refrained from applying the independent duty doctrine to bar tort claims based on potential duties arising in connection with, but independent of, real estate sales negotiations. As the dissent in *Austin v. Ettl* summarizes, "Overall, cases explaining the independent duty doctrine seem to indicate that claims and alleged damages arising from a contractual relationship, even those executed at arm's length, are subject to a tort sieve." *Austin v. Ettl*,

---

[44] As our colleague recently noted in *Austin v. Ettl*:

> The independent duty doctrine seems to fail its intended purpose of assisting practitioners and trial courts in determining whether a tort claim may exist when the parties have executed a contract or where statutes exist establishing duties and remedies with regard to the subject of the lawsuit. The economic loss rule was of some utility in this analysis in saying that where the losses claimed are *solely* economic, the contract likely controls. Under the independent duty doctrine, whether a tort exists paralleling or supplementing a contract has to be decided on a case by case basis after examining the facts of the case. If an independent tort duty does exist and the Supreme Court has not ruled on the fact situation, the trial court and parties are no closer to determining whether the contract or statutes prevail with regard to the duties owed. In these cases, forbidding the trial courts and intermediate appellate courts from developing answers unnecessarily delays clarification of the law with regard to tort claims in the contract context.

171 Wn. App. 82, 96 n.15, 286 P.3d 85 (2012) (Van Deren, J., dissenting).

[45] *See, e.g., Alejandre*, 159 Wn.2d at 681-85; *Eastwood*, 170 Wn.2d at 417 (Chambers, J., concurring).

171 Wn. App. 82, 97, 286 P.3d 85 (2012) (Van Deren, J., dissenting).[46]

¶42 We apply this recent independent duty case law here, especially in light of the express admonition to lower courts not to reject potential tort claims, even if arguably contract-related, until the Supreme Court specifically so rules. Thus far, our Supreme Court has allowed claims to proceed for the following torts where the plaintiff can establish a tort duty owed by the defendant, independent of the related contract between them: Fraud, negligent misrepresentation, and tortious interference with contract.[47] *See Jackowski*, 174 Wn.2d at 738; *Elcon*, 174 Wn.2d at 165-66.

---

[46] The *Austin* majority held that purchaser Austin failed to plead a prima facie case for tort claims against the property sellers, the Ettls; these tort claims included a claim of negligent misrepresentation for the Ettls' failure to disclose potential costs of a proposed local improvement district (LID) assessment against the property. *Austin*, 171 Wn. App. at 85, 93. Austin's negligent misrepresentation claim against the Ettls, however, is distinguishable from Key's negligent misrepresentation claims against the Port. The Ettls clearly told Austin about the existence of a potential LID assessment, but they did not disclose the potential assessment amount; this omission implicated, but ultimately did not run afoul of, the sellers' "duty to disclose" in a business transaction context. *Austin*, 171 Wn. App. at 91. Therefore, the *Austin* majority held that the trial court did not err in granting the Ettls' CR 12(b)(6) motion to dismiss Austin's negligent misrepresentation claims. *Austin*, 171 Wn. App. at 92-93.

In contrast, here, the Port provided *neither a partial nor an ambiguous statement of facts* analogous to the Ettls' partial LID disclosure, which might arguably have given rise to a similar "duty to disclose" *additional* information. Rather, the Port made apparently complete, but arguably incorrect and misleading, statements of a critical fact, namely, that it needed and intended to purchase Key's property to use for relocating Superlon from its existing site, which site the Port was condemning to use in the Port's East Blair Project.

[47] Although *Alejandre* appeared to bar tort claims in the context of real estate sales, that case involved significant defect disclosures in a contract to sell real property, which contract also expressly required the buyer to inspect the property. *Alejandre*, 159 Wn.2d at 678-79. Here, in contrast, Key allegedly lost other opportunities to sell or to lease its property based on the Port's express, but allegedly false, representation that it was moving forward to condemn the Superlon property, a property outside the context of its LOI with Key. Furthermore, the alleged falsity in the Port's representation is not something that Key could likely have discovered on its own like the failed septic systems that the buyers in *Alejandre* could have discovered on their own with an inspection of the system. *See Alejandre*, 159 Wn.2d at 678.

¶43 In *Jackowski*, the Court held that the plaintiff's fraud claims were independent of the related real estate purchase and sale contract and, therefore, allowable under the independent duty doctrine: "Because the duty to not commit fraud is independent of the contract, the independent duty doctrine permits a party to pursue a fraud claim regardless of whether a contract exists." *Jackowski*, 174 Wn.2d at 738. Although arguably dicta, the Supreme Court further opined that plaintiffs may bring contract-related negligent misrepresentation claims if the duty not to commit negligent misrepresentation is independent of the contract. *Jackowski*, 174 Wn.2d at 738. Similarly, in *Elcon*, the Court opined, again arguably in dicta, that the independent duty rule did not bar plaintiff's tortious interference claim against the defendant, despite the existence of a related drilling contract. *Elcon*, 174 Wn.2d at 165-66. Thus, the Supreme Court's *Jackowski* holding and its admonitions in *Eastwood* and *Elcon* strongly suggest that the independent duty rule should not foreclose Key's opportunity to attempt proving its tort claims against the Port at trial.[48]

¶44 Accordingly, we reverse the trial court's grant of summary judgment to the Port on Key's tort claims and remand to the trial court to consider, in light of the Supreme Court's re-articulation of the independent duty doctrine in *Jackowski*,[49] (1) whether there were any tort duties the Port owed Key that arose independently of the parties'

[48] Although Key's negotiations with the Port involved only a letter of intent and did not culminate in the contemplated real estate sale, we nevertheless deem it prudent to adopt this approach in light of the Supreme Court's recent holdings, admonitions, and dicta. If we have misapprehended the Supreme Court's directions in this emerging area of the law, this case will present the Court with an opportunity to clarify application of the independent duty doctrine to statements and representations made by purchasers of real property that arguably give rise to tort claims independent of the real estate contract.

[49] In its reply brief, the Port states, "No Washington court has ever found that a potential buyer of real property owes the seller any duty regarding representations about the potential buyer's intention to purchase the property." Reply Br. of Appellant at 44. Assuming this assertion to be true, however, does not answer the question about whether representations the Port made to Key about its need for Key's property for relocating Superlon could subject the Port to potential liability in tort independent of the LOI. For example, according to Trinity and Key's in-house

contract (their LOI); and (2) whether there are genuine issues of material fact to defeat summary judgment and to support going to trial on Key's tort claims.[50] We hold, therefore, that the independent duty rule does not bar Key's tort claims against the Port as a matter of law and that dismissal of these tort claims on summary judgment based on the economic loss rule was error.[51]

### b. Trinity's tort claims against the Port

¶45 The trial court's certified issue—whether the independent duty doctrine applies to third party beneficiaries of a contract—and the interlocutory nature of this appeal limit the scope of our review to whether the former economic loss rule, since recharacterized as the independent duty doctrine, similarly bars Trinity's tort claims. We do not, therefore, consider whether Trinity can establish a valid tort claim against the Port; rather, we address only whether the independent duty doctrine bars Trinity's ability to raise these claims.

¶46 The Port argues that Trinity was a third party beneficiary of the contract with Key and, thus, it owed Trinity no duty independent of this contract. On the record before us, however, Trinity does not appear to have been a

counsel, So, the Port represented to Key that (1) the Port's condemning the Superlon property for the East Blair Project was a *certainty*, (2) *Superlon must be relocated*, and (3) Key's property was the *only available property that could accommodate Superlon's physical relocation needs* and the Port's timing requirements.

[50] This time, when it addresses Key's tort claims on remand, the trial court will not be curtailed at the outset by the economic loss rule/independent duty doctrine's previously apparent outright bar of these claims. If the trial court determines that such tort duties existed independent of Key's and the Port's contract, in order to prevail on its misrepresentation claim, Key would also need to establish that the Port breached its duty and that over the extended course of negotiations Key had a right to rely on the Port's representations about its intent to purchase Key's property for relocating Superlon. See, for example, under *Jackowski*.

[51] Because of the interlocutory nature of our review, the resultant sparse record before us, and the narrow issue certified to us by the trial court, we address only whether the former economic loss rule barred Key's claims, evaluated in light of the new independent duty doctrine. Again, we do not address whether, as a matter of law or fact, Key will be able to prove its tort claims at trial.

third party beneficiary of Key's contract with the Port. Rather, the record supports the trial court's conclusion that Trinity's involvement, if any, fell outside Key's property sale negotiations with the Port. Thus, we agree with the trial court that, because Trinity was neither a party to the contract nor a third-party beneficiary, the economic loss rule/independent duty rule does not bar Trinity's tort claims against the Port.[52]

¶47 "A third-party beneficiary is one who, though not a party to the contract, will nevertheless receive *direct* benefits therefrom." *McDonald Constr. Co. v. Murray*, 5 Wn. App. 68, 70, 485 P.2d 626, *review denied*, 79 Wn.2d 1009 (1971) (emphasis added). It is insufficient that performance of a contract may benefit a third party; rather, the contract must have been entered for that party's benefit, or the benefit must be a direct result of performance within the parties' contemplation. *McDonald*, 5 Wn. App. at 70. The contracting parties must intend to create such a relationship, with the promisor intending to assume a direct obligation to the third party at the time the contract is created. *Ramos v. Arnold*, 141 Wn. App. 11, 21, 169 P.3d 482 (2007) (citing *Schaaf v. Highfield*, 127 Wn.2d 17, 21 n.5, 896 P.2d 665 (1995)). Determining the parties' intent requires determining whether performance under the contract necessarily and directly benefits the third party; again, an incidental or inconsequential benefit is insufficient. *Warner v. Design & Build Homes, Inc.*, 128 Wn. App. 34, 43, 114 P.3d 664 (2005).

¶48 On the record before us, Trinity's relationship to the Key-Port LOI contract does not meet this standard and, therefore, Trinity fails to qualify as a third-party beneficiary. The record contains no evidence that the Port intended to assume a direct obligation to Trinity or that Trinity would directly benefit from performance of this contract. Thus, any benefit Trinity might have received

---

[52] Again, this is not to say that Trinity's tort claims will be able to withstand challenges on other grounds on remand.

from this contract, and from an eventual sale of the property under a never-realized purchase and sale agreement, would have been indirect. That Trinity might have saved rent money by leasing a different property, if Key had sold its property to the Port, would have been at best only an incidental result of Key and the Port's LOI.

¶49 The record supports the trial court's conclusion that Trinity was neither a party to the Key-Port contract nor a third-party beneficiary. Therefore, we hold that the independent duty doctrine does not bar Trinity's tort claims against the Port. And we affirm the trial court's reinstatement of those claims and denial of summary judgment to the Port.[53]

## II. OBJECTION TO "PLAINTIFFS' STATEMENT OF UNCONTESTED FACTS—CORRECTED"

¶50 Claiming a violation of RAP 10.3(a)(5), the Port moves to strike from Key and Trinity's appellate brief their citation to a document included in the clerk's papers at 1690-1727, "Plaintiffs' Statement of Uncontested Facts— Corrected." According to the Port, this document

> consists of trial counsel's own "summaries" of statements found in various other pleadings, declarations, and depositions, taken out of context, many of which are not "summaries" at all, but are instead conclusory misrepresentations of the facts or are, at best, misleading.

Reply Br. of Appellant at 1. The Port argues that (1) the trial court never found any of the facts set out in this document, (2) the Port objected below to the document,[54] and (3) we

---

[53] Again, because of the narrow scope of this interlocutory appeal, we do not address the validity of Trinity's tort claims. And we leave for the trial court to assess on remand whether the Port owed Trinity a duty in tort and whether the Port breached such duty.

[54] The Port cites "CP 228 and fn2[;] CP 229; CP 530-534; CP 569-579" to support its assertion that it "objected below to this document." Reply Br. of Appellant at 1. A review of this part of the record shows that the Port objected to specific

and the Port are "forced to search for the page number cited within the 'Statement of Uncontested Facts' and then search again for the actual page in the record on which the asserted 'fact' is found." Reply Br. of Appellant at 1-2.

¶51 Key and Trinity respond that this document "was part of the trial record, was considered by the trial court, and was duly designated in the clerk's papers" and that the Port chose not to contest most of the facts with the trial court. Reply Br. of Resp't at 4-5. The record supports these assertions.[55]

¶52 The question before us is whether we should treat the Port's objection as a motion to strike the document as noncompliant with RAP 10.3(a)(5). RAP 10.3(a)(5) requires an appellant to include "[a] fair statement of the facts and procedure relevant to the issues presented for review, without argument" and with reference to the record "included for each factual statement." This document was part of the record the trial court considered. We can determine internal references within the document using the index filed with the court under RAP 9.7; thus, we perceive no violation of RAP 10.3(a)(5). Accordingly, we deny the Port's motion to strike all references to "Plaintiffs' Statement of Uncontested Facts—Corrected."

¶53 We deny the Port's request to strike "Plaintiffs' Statement of Uncontested Facts—Corrected." We reverse the trial court's summary judgment dismissal of Key's tort claims against the Port. We affirm the trial court's reinstatement of Trinity's tort claims against the Port and the trial court's corresponding denial of summary judgment to the Port on these claims. And we remand to the trial court

inferences and statements contained in the "Plaintiffs' Statement of Uncontested Facts—Corrected" and generally characterized the document as containing misrepresentations, conclusions, and facts based on hearsay.

[55] Despite reflecting the Port's objection, the record does not show that the Port asked the trial court to strike all references to the "Plaintiffs' Statement of Uncontested Facts—Corrected," as it is doing now for the first time on appeal. Moreover, in rendering its summary judgment decisions, the trial court considered the Port's specific objections to these facts. Thus, in reviewing summary judgment from the trial court's perspective, we, too, must review these facts.

to consider (1) whether, under *Jackowski*, Key can show that the Port owed it a tort duty independent of their contract; (2) whether Trinity can show that the Port owed it a tort duty; and (3) if Key or Trinity establish such tort duties, whether there exist genuine issues of material showing breaches of these duties to survive summary judgment and to go to trial.[56]

WORSWICK, C.J., concurs.

¶54 QUINN-BRINTNALL, J. (concurring) — While I concur with my colleagues, I write separately to stress that we accepted discretionary review of this case solely to determine whether the former "economic loss" rule—now the independent duty doctrine—requires dismissal of Key Development Investment and Trinity Glass International's claims against the Port of Tacoma. But our Supreme Court has "directed lower courts not to apply the [independent duty] doctrine to tort remedies 'unless and until [the Washington Supreme Court] has, based upon considerations of common sense, justice, policy and precedent, decided otherwise.'" *Elcon Constr., Inc. v. E. Wash. Univ.*, 174 Wn.2d 157, 165, 273 P.3d 965 (2012) (quoting *Eastwood v. Horse Harbor Found., Inc.*, 170 Wn.2d 380, 417, 241 P.3d 1256 (2010) (plurality opinion) (Chambers, J., concurring)). Although our Supreme Court's independent duty doctrine jurisprudence is woefully unclear, the only rational reading of *Elcon* is that lower courts should presume that a tort duty exists unless and until the Washington Supreme Court has de-

---

[56] It is not our intent that these remand instructions reflect any evaluation by us about the ultimate viability of Key's or Trinity's tort claims, including whether, even taking the facts in the light most favorable to Trinity, it can show that the Port owed it a duty, the breach of which could give support to its tort claims. These issues are not before us in this interlocutory appeal, limited to determining only whether Key's and Trinity's tort claims against the Port are barred as a matter of law by the economic loss rule/independent duty doctrine. And, as we state above, they are not. As the Supreme Court noted in *Eastwood*, "Once the independent duty is held to exist as a matter of law, the connection between the breach and the plaintiff's injury becomes a factual question of proximate cause." 170 Wn.2d at 399.

cided otherwise. Accordingly, remand is required in this case.[57]

---

[57] Despite this result, I agree with my colleague, Judge Van Deren, in believing that "forbidding the trial courts and intermediate appellate courts from developing answers" whenever the independent duty doctrine is implicated "unnecessarily delays clarification of the law with regard to tort claims in the contract context." *Austin v. Ettl*, 171 Wn. App. 82, 96 n.15, 286 P.3d 85 (2012) (Van Deren, J., dissenting).